UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In Re: | : | |
| | : | |
| BRAY & GILLESPIE | : | |
| MANAGEMENT, LLC, *et al.* | : | No.: 3:08-bk-05473 -JAF |
| | : | |
| | : | CHAPTER 11 |
| | : | |
| Debtors. | : | Jointly-Administered with cases |
| | : | 3:08-bk-05474 through 3:08-bk-05551 |
| | : | |
| | : | |
| Applicable Debtor: | : | |
| | : | |
| BRAY & GILLESPIE XVIII LLC | : | |
| | : | |
| Case No.: 3:08-bk-05524-JAF | : | |

**SUPER 8 WORLDWIDE, INC.'S RESPONSE TO FEDERAL TRUST BANK'S MOTION
FOR RELIEF FROM AUTOMATIC STAY (BRAY & GILLESPIE XVIII)**

Super 8 Worldwide, Inc. ("SWI"), by its undersigned attorneys, files this Response to the

Motion to for Relief from the Automatic Stay (the "Motion") filed by Federal Trust Bank ("FTB")

and would respectfully show the following in support thereof:

## I.    RELEVANT FACTS

**A.    Background.**

1.    SWI and Jayesh Patel ("Patel") entered into a Franchise Agreement and related

agreements dated December 26, 2000 (collectively, the "Franchise Agreement"). Per an

Assignment and Assumption Agreement dated August 24, 2005, the Franchise Agreement was

assigned to Bray & Gillespie XVIII, LLC ("B&G"). Pursuant to the Franchise Agreement and

Assignment Agreement, B&G was authorized to operate the property at 600 North Atlantic

Avenue, Daytona Beach, Florida 32118 (the "Facility") as a Super 8 guest lodging facility.

Copies of the Franchise Agreement and Assignment and Assumption Agreement are attached hereto as Exhibit "A".

2.    SWI does not own or operate any hotels.  Instead, SWI operates a guest-lodging facility franchise system.  The system, broadly stated, is comprised of various trade names and service marks (which are on the principal register of the United States Patent and Trademark Office), logos and derivations thereof (collectively, the "Super 8 Marks").  The system generally consists of certain standards, advertising, and centralized support functions, including a nationwide computer reservation system.

3.    The hotels operating as part of the franchise system are all independently owned and operated.  SWI allows its licensees, pursuant to individual Franchise agreements, to operate their hotels as guest-lodging facilities utilizing the Super 8 Marks.

4.    SWI has the exclusive right to sublicense the use of the Super 8 Marks, as well as its distinctive franchise system. SWI or its predecessors have continuously used each of the Super 8 Marks since the date of their registration and these marks are in full force and effect pursuant to 15 U.S.C. §1065.  SWI has given notice to the public of the registration of the Super 8 Marks as provided in 15 U.S.C. §1111.

5.    SWI has invested substantial effort and capital over a long period of time to cause consumers throughout the United States to recognize the Super 8 Marks as distinctly designating its franchisee's guest-lodging services as being affiliated with SWI.

**B.    The Franchise Agreement.**

6.    The Franchise Agreement between SWI and the Debtor requires the Debtor to operate the Facility as a "Super 8" for a term of 20 years.

7. Section 9 of the Franchise Agreement provides that the license granted by SWI is a non-exclusive, personal license granted to the Debtor only:

> This Agreement is personal to you (and your owners if you are an entity). We are relying on your experience, skill and financial resources (and that of your owners and the guarantors, if any) to sign this Agreement with you. You may finance the Facility and grant a lien, security interest or encumbrance on it without notice or our consent. If a Transfer is to occur, the transferee or you must comply with Section 9.3. Your license is subject to termination when the Transfer occurs. The License is not transferable to your transferee, who has no right or authorization to use the System and the Marks when you transfer ownership or possession of the Facility. The transferee may not operate the Facility under the System, and you are responsible for performing the post-termination obligations in Section 13.

8. The Franchise Agreement requires the Debtor to pay SWI "Recurring Fees", including royalties, basic reservation charges, taxes and interest. Id. at Section 7. The Debtor is obligated to pay the Recurring Fees within fifteen days after the month in which they accrue, without billing or demand. Id. Nonpayment by the Debtor is an event of default under the Franchise Agreement. Id. at Section 11.1. Loss of possession by the Debtor is not only a separate event of default under the Franchise Agreement; it is an incurable event of default. Id. at Section 11.2.

## C. The Debtor's Breach of the Franchise Agreement.

9. On September 12, 2008, the Debtor filed a chapter 11 bankruptcy proceeding with this Court. The Debtor's filing was part of a coordinated filing of 78 related entities. At the time of the bankruptcy filing, the Debtor was indebted to SWI in the amount of $20,125.34 for Recurring Fees and other obligations under the Franchise Agreement (the "Pre-Petition Indebtedness"). The Pre-petition Indebtedness is reflected in the proof of claim filed by SWI on or about November 21, 2008. A copy of the proof of claim is attached hereto as Exhibit "B".

10. The Debtor is also delinquent in the payment of <u>post-petition</u> Recurring Fees to SWI. As of February 17, 2009, the Debtor owed SWI $ 6,669.19 in post-petition Recurring Fees. A copy of the post-petition statement is attached hereto as Exhibit "C".

11. SWI has reminded the Debtor of its obligations to stay current on its post-petition obligations under the Franchise Agreement. *See* correspondence dated November 7, 2008. A copy of that correspondence is attached hereto as Exhibit "D".

**D.** **The Stay relief Motion file by Federal Trust Bank.**

12. On or about December 11, 2008, FTB filed a motion for relief from the automatic stay (the "Motion"). As set forth in the Motion, FTB is the holder of two separate promissory notes and mortgages against the Facility. The purpose of FTB's motion is to "enforce [its] liens against property of the estate." *See* Motion, paragraph 14.

## II.    ARGUMENT

13. SWI takes no position as to the merits of the FTB motion. Having said that however, should FTB obtain stay relief and pursue foreclosure to completion, it would invariably result in the ultimate foreclosure sale of the Facility itself and a loss of possession thereof by the Debtor.

14. Once the Debtor loses possession of the Facility, it is an incurable event of default under the Franchise Agreement. Additionally, since the Franchise Agreement is personal to the Debtor, the successor to possession, whether it be FTB, a Receiver or some other third party, will have absolutely no rights to operate the Facility as a "Super 8" or display the Super 8 Marks, nor will that party succeed to any rights under the Franchise Agreement. In fact, absent a separate written agreement with SWI, any subsequent continuing operation of the Facility without de-identifying same from its appearance as a "Super 8" would constitute willful infringement upon

SWI's protected intellectual property under the Lanham Act (15 U.S.C. §§ 1051 *et seq.*) and other applicable laws.

15. SWI submits that the incurable default and likely infringement that would be occasioned by any loss of possession would constitute "cause" for relief from the automatic stay in favor of SWI within the meaning of 11 U.S.C. § 362(d)(1) and that SWI could not be otherwise "adequately protected" within the meaning of the statute.

16. In light of the foregoing, SWI submits that any order granting stay relief to FTB should contain a provision that, in the event that the Debtor is removed from possession of the Facility, the grant of stay relief shall be extended to SWI for purposes of authorizing SWI to terminate the Franchise Agreement, arrange for the de-identification of the Facility and/or otherwise assert its rights under the Franchise Agreement.

17. To the extent that the Court is not inclined to grant such contingent stay relief to SWI, SWI specifically reserves all rights to independently seek such relief and further reserves all of its rights and remedies with respect to any possible infringement or other unauthorized use of its protected intellectual property.

## III. CONCLUSION

18. For the foregoing reasons, SWI requests that any grant of stay relief to FTB contain a contingent grant of stay relief to SWI to be triggered if the Debtor is removed from possession of the Facility.

Date: March 3, 2009

FOLEY & LARDNER LLP

/s/ Gardner F. Davis
Gardner F. Davis
    Florida Bar No. 0471712
    gdavis@foley.com
John J. Wolfel, Jr.
    Florida Bar No. 030664

jwolfel@foley.com
One Independent Drive, Suite 1300
Jacksonville, FL 32202-5017
P. O. Box 240
Jacksonville, FL 32201-0240
904.359.2000

and

/s/ David S. Catuogno
David S. Catuogno, Esq.
FORMAN HOLT ELIADES & RAVIN LLC
80 Route 4 East – Suite 290
Paramus, NJ 07652
Tel. (201) 845-1000
Fax (201) 845-9112

ATTORNEYS FOR SUPER 8 WORLDWIDE, INC.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true copy of this Response has been served by (i) CM/ECF transmission to the parties who are recipients of service by the Court's CM/ECF Transmission, and (ii) prepaid, first class U.S. mail to the parties-in-interest as shown on the first list below, on the <u>3rd</u> day of March 2009:

**Jimmy D Parrish** and **R Scott Shuker**
Latham Shuker Eden & Beaudine LLP
Post Office Box 3353
Orlando, FL 32802
(407) 481-5800
Fax : (407) 481-5801

**John B. Macdonald**
Akerman Senterfitt
50 North Laura Street
Suite 2500
Jacksonville, FL 32202
904-798-3700
Fax : 904-798-3730

**Mariane L Dorris**
Latham Shuker Eden & Beaudine LLP
390 North Orange Avenue
Suite 600
Orlando, FL 32801
(407) 481-5800

Fax : (407) 481-5801


**Peter N Hill**
Wolff Hill McFarlin & Herron PA
1851 West Colonial Drive
Orlando, FL 32804
407-648-0058
Fax : 407-648-0681


**Miriam G Suarez BG**
Office of the United States Trustee
135 West Central Blvd Suite 620
Orlando, FL 32801
407-648-6301 x 126
Fax : 407-648-6323

**Jeffry R. Jontz**
Swann & Hadley, P.A.
Post Office Box 1961
Winter Park, FL 32790-1961

FOLEY & LARDNER LLP

/s/ Gardner F. Davis
Gardner F. Davis
   Florida Bar No. 0471712
   gdavis@foley.com
John J. Wolfel, Jr.
   Florida Bar No. 030664
   jwolfel@foley.com
One Independent Drive, Suite 1300
Jacksonville, FL 32202-5017
P. O. Box 240
Jacksonville, FL 32201-0240
904.359.2000

and

/s/ David S. Catuogno
David S. Catuogno, Esq.
FORMAN HOLT ELIADES & RAVIN LLC
80 Route 4 East – Suite 290
Paramus, NJ 07652
Tel. (201) 845-1000
Fax (201) 845-9112
ATTORNEYS FOR SUPER 8 WORLDWIDE, INC.

**EXHIBIT A**
**(see attached)**

# SUPER 8 MOTELS, INC.
## FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT ("Agreement"), dated <u>12·26</u>, 200 <u>0</u>, is between SUPER 8 MOTELS, INC., a South Dakota corporation ("we", "our" or "us"), and <u>Jayesh Patel, a _____ resident</u> ("you"). The definitions of capitalized terms are found in Appendix A. In consideration of the following mutual promises, the parties agree as follows:

**1.    License.**   We have the exclusive right to license and franchise to you the distinctive "Super 8" System for providing economy lodging motel services. We grant to you and you accept the License, effective and commencing on the Opening Date and ending on the earliest to occur of the Term's expiration or a Termination. The License is effective only at the Location and may not be transferred or relocated. You will call the Facility a "Super 8 Motel" and you may adopt additional or secondary designations for the Facility with our prior written consent, which we may withhold, condition, or withdraw on written notice in our sole discretion. You shall not affiliate or identify the Facility with another franchise system, brand, cooperative or registered mark during the Term.

**2.    Protected Territory.**   We will not own, operate, lease, manage, or license anyone but you to operate a Chain Facility of the same name (Super 8 Motel) in the "Protected Territory", defined in Appendix A, while this Agreement is in effect. We may own, operate, lease, manage, franchise or license anyone to operate any Chain Facility located anywhere outside the Protected Territory without any restriction or obligation to you. We may grant Protected Territories for other Chain Facilities that overlap your Protected Territory. While this Agreement is in effect, neither you nor your officers, directors, general partners or owners of 25% or more of your Equity Interests, may own, operate, lease, manage or franchise any guest lodging facility other than the Facility in the Protected Territory (other than the Facility) unless we or our affiliate licenses the facility. You will use any information obtained through the Reservation System to refer guests, directly or indirectly, only to Chain Facilities. This Section does not apply to any Chain Facility located in the Protected Territory on the Effective Date, which we may renew, relicense, allow to expand, or replace with a replacement Facility located with the same trading area having not more than 120% of the guest rooms of the replaced Chain Facility if its franchise with us terminated or is not renewed. The Protected Territory fairly represents the Facility's trading area, and you acknowledge that. There are no express or implied territorial rights or agreements between the parties except as stated in this Section. The covenants in this Section are mutually dependent; if you breach this Section, your Protected Territory will be the Location only.

**3.    Your Improvement and Operating Obligations.**   Your obligations to improve, operate and maintain the Facility are:

**3.1    Improvements.**   You must select and acquire the Location and acquire, equip and supply the Facility in accordance with System Standards. You must provide us with proof that you own or lease the Facility before or within 30 days after the Effective Date. You must begin renovation of the

3.7 **Governmental Matters.** You will obtain as and when needed all governmental permits, licenses and consents required by law to construct, acquire, renovate, operate and maintain the Facility and to offer all services you advertise or promote. You will pay when due or properly contest all federal, state and local payroll, withholding, unemployment, beverage, permit, license, property, ad valorem and other taxes, assessments, fees, charges, penalties and interest, and will file when due all governmental returns, notices and other filings.

3.8 **Financial Books & Records; Audits.**

3.8.1 The Facility's transactions must be timely and accurately recorded in accounting books and records prepared on an accrual basis compliant with generally accepted accounting principles of the United States ("GAAP") and consistent with the most recent edition of the Uniform System of Accounts for the Lodging Industry published by the American Hotel & Motel Association, as modified by this Agreement and System Standards. You acknowledge that your accurate accounting for and reporting of Gross Room Revenues is a material obligation you accept under this Agreement.

3.8.2 We may notify you of a date on which we propose to audit the Facility's books and records. You will be deemed to confirm our proposed date unless you follow the instructions with the audit notice for changing the date. You need to inform us where the books and records will be produced. You need to produce for our auditors at the confirmed time and place for the audit the books, records, tax returns and financial statements relating to the Facility for the applicable accounting periods we require under this Agreement and System Standards. If our auditors must return to your location after the first date we confirm for the audit because you violate this Section 3.8.2 or refuse to cooperate with the reasonable requests of our auditors, you must pay us the Audit Fee under Section 4.8 when invoiced. We may also perform an audit of the Facility's books and records without advance notice. Your staff must cooperate with and assist our auditors to perform any audit we conduct.

3.8.3 We will notify you in writing if you default under this Agreement because (i) you do not cure a violation of Section 3.8.2 within 30 days after the date of the initial audit, (ii) you cancel 2 or more previously scheduled audits, (iii) you refuse to admit our auditors for an audit during normal business hours at the place where you maintain the Facility's books and records, or refuse to produce the books and records required under this Agreement and System Standards for the applicable accounting periods, (iv) our audit determines that the books and records you produced are incomplete or show evidence of tampering or violation of generally accepted internal control procedures, or (v) our audit determines that that you have reported to us less than 97% of the Facility's Gross Room Revenues for any fiscal year preceding the audit. Our notice of default may include, in our sole discretion and as part of your performance needed to cure the default under this Section 3.8, an "Accounting Procedure Notice." You must also pay any deficiency in Recurring Fees or other charges we identify and invoice as a result of the audit. The Accounting Procedure Notice requires that you obtain and deliver to us, within 90 days after the end of each of your next three fiscal years ending after the Accounting Procedure Notice, an audit opinion signed by an independent certified public accountant who is a member of the American Institute of Certified Public Accountants addressed to us that the Facility's Gross Room Revenues you reported to us during the fiscal year fairly present the Gross Room Revenues of the Facility computed in accordance with this Agreement for the fiscal year.

3.9 **Inspections.** You acknowledge that the Facility's participation in our quality assurance inspection program (including unannounced inspections) is a material obligation you accept under this Agreement. You will permit our representatives to perform quality assurance inspections of the Facility at any time with or without advance notice. The inspections will commence during normal business hours although we may observe Facility operation at any time. You and the Facility staff will cooperate with the inspector performing the inspection. If the Facility fails an inspection, you refuse to cooperate with our inspector, or you refuse to comply with our published inspection System Standards, then you will pay us when invoiced for any reinspection fee specified in System Standards Manuals (which will not exceed $500) plus the reasonable travel, lodging and meal costs our inspector incurs for a reinspection. We may publish and disclose the results of quality assurance inspections.

3.10 **Insurance.** You will obtain and maintain during the Term of this Agreement the insurance coverage required under the System Standards Manual from insurers meeting the standards established in the Manual. Unless we instruct you otherwise, your liability insurance policies will name Super 8 Motels, Inc., Cendant Finance Holding Corporation and Cendant Corporation, their successors and assigns as additional insureds.

3.11 **Conferences.** Chain conferences are held on either a chain-wide or regional basis. You or your representative will attend each Chain conference and pay the Conference Fee we set for Chain franchisees, if and when we determine to hold a Chain Conference. The Fee will be the same for all U.S. and Canadian facilities that we franchise. You will receive reasonable notice of a Chain conference.

3.12 **Purchasing.** You will purchase or obtain certain items we designate as proprietary or that bear Marks, such as signage, only from suppliers we approve. You may purchase any other items for the Facility from any competent source you select, so long as the items meet or exceed System Standards.

3.13 **Good Will.** You will use reasonable efforts to protect, maintain and promote the name "Super 8 Motels" and its distinguishing characteristics, and the other Marks. You will not permit or allow your officers, directors, principals, employees, representatives, or guests of the Facility to engage in, conduct which is unlawful or damaging to the good will or public image of the Chain or System. You will follow System Standards for identification of the Facility and for you to avoid confusion on the part of guests, creditors, lenders, investors and the public as to your ownership and operation of the Facility, and the identity of your owners. You will refer any guest that the Facility cannot accommodate to the nearest Chain Facility unless and until the guest expresses a preference for a different lodging facility. You will participate in any Chain-wide guest service and satisfaction guaranty programs we require in good faith for all Chain Facilities.

3.14 **Frequent Guest Programs.** You recognize that the Super 8 "VIP Card" program is an integral part of the System. You will participate in the VIP Card program and other proprietary frequent guest programs we may require from time to time, subject to compliance with applicable law.

3.15 **Facility Modifications.** You may materially modify, diminish or expand the Facility (or change its interior design, layout, FF&E, or facilities) only after you receive our prior written consent,

which we will not unreasonably withhold or delay. You will pay our Rooms Addition Fee then in effect for each additional guest room you may add to the Facility over 120 rooms. If we so request, you will obtain our prior written approval of the plans and specifications for any material modification, which we will not unreasonably withhold or delay. You will not open to the public any material modification until we inspect it for compliance with the Approved Plans and System Standards.

3.16   **Courtesy Lodging.** You will provide lodging at the "Employee Rate" established in the System Standards Manual from time to time (but only to the extent that adequate room vacancies exist) to our representatives traveling on business, but not more than three standard guest rooms at the same time.

4.   **Our Operating and Service Obligations.** We will provide you with the following services and assistance:

4.1   **Training.** We will offer the orientation and manager training programs described in Section 3.5 at our offices in Parsippany, New Jersey or at another location we designate. The manager training program will not exceed three weeks in duration and will cover such topics as System Standards, services available from us, and operating a Chain Facility. Orientation will not exceed three days. We may charge tuition of up to $500.00 for each manager or other employee who attends the manager training program. You must pay for your representative's travel, lodging, meals, incidental expenses, compensation and benefits. We do not charge tuition for orientation, but you must pay for your travel, meal and lodging expenses of attending. We may conduct additional mandatory or optional training for your employees, including, subject to the availability of our training personnel, an optional property opening orientation at the Facility. We may charge reasonable tuition for these additional programs. We may offer or sell to you video tapes, computer discs or other on-site training aids and materials, or require you to buy them at reasonable prices. A portion of the Advertising and Reservation Fund proceeds, determined in our sole discretion, will be allocated to our training activities and related direct and indirect overhead expenses.

4.2   **Reservation System.** We will operate and maintain (directly or by subcontracting with an affiliate or one or more third parties) a computerized Reservation System or such technological substitute(s) as we determine, in our discretion. We will use System Assessment Fees as specified in Schedule C, allocated in our discretion from the Advertising and Reservation Fund, for the acquisition, development, support, equipping, maintenance, improvement and operation of the Reservation System. The Facility will participate in the Reservation System, commencing with the Opening Date for the balance of the Term. We have the right to provide reservation services to lodging facilities other than Chain Facilities or to other parties. We will not offer to or accept from callers to our general consumer, toll-free telephone number in the United States reservations for any lodging facilities other than Chain Facilities. We may use funds in the Advertising and Reservation Fund to reimburse our reasonable direct and indirect costs, overhead or other expenses of operating the Reservation System.

4.3   **Marketing**

4.3.1   We will use System Assessment Fees, allocated in our discretion from the Advertising and Reservation Fund, to promote public awareness and usage of Chain Facilities by implementing appropriate international, national, regional and local advertising, promotion, publicity, market research

and other marketing programs, training programs and related activities, and the production and distribution of System publications and directories of hotels. We will determine in our discretion: (i) The nature and type of media placement; (ii) The allocation (if any) among international, national, regional and local markets; and (iii) The nature and type of advertising copy, other materials and programs. System Assessment Fees may reimburse us or an affiliate for the reasonable direct and indirect costs, overhead or other expenses of providing marketing services. We are not obligated to supplement the Advertising and Reservation Fund or to advance funds to pay for System marketing activities. We do not promise that you or the Facility will benefit directly or proportionately from System marketing activities.

4.3.2 We may, at our discretion, implement special international, national, regional or local promotional programs (which may or may not include the Facility) and may make available to you (to use at your option) media advertising copy and other marketing materials for prices which reasonably cover the materials' direct and indirect costs.

4.3.3 We may, at our discretion, implement "group booking" programs created to encourage use of Chain Facilities for tours, conventions and the like, possibly for separate fees in addition to the System Assessment Fee, for any resulting group booking accepted at the Facility.

4.3.4 We will publish the Chain Directory. We will supply Directories to you for display at locations specified in the System Standards Manual or policy statements. We will include the Facility in the Chain Directory after it opens if you submit the information we request on time, and you are not in default under this Agreement at the time we must arrange for publication. We may assess a reasonable charge for the direct and indirect expenses (including overhead) of producing and delivering the Directories.

4.4 **Purchasing.** We may offer optional assistance to you with purchasing items used at or in the Facility. Our affiliates may offer this service on our behalf. We may restrict the vendors authorized to sell proprietary or Mark-bearing items in order to control quality, provide for consistent service or obtain volume discounts. We will maintain and provide to you lists of suppliers approved to furnish Mark-bearing items, or whose products conform to System Standards.

4.5 **The System.** We will control and establish requirements for all aspects of the System. We may, in our discretion, change, delete from or add to the System, including any of the Marks or System Standards, in response to changing market conditions. We may, in our discretion, permit deviations from System Standards, based on local conditions and our assessment of the circumstances.

4.6 **Consultations and Standards Compliance.** We will assist you to understand your obligations under System Standards by telephone, mail, during quality assurance inspections, through the System Standards Manual, at training sessions and during conferences and meetings we conduct. We will provide telephone and mail consultation on matters of Facility operation and marketing through our representatives. We will offer you access to any Internet website we may maintain to provide Chain franchisees with information and services, subject to any rules, policies and procedures we establish for its use and access and to this Agreement. We may limit or deny access to any such website while you are in default under this Agreement.

4.7     **System Standards Manual and Other Publications.** We will specify System Standards in the System Standards Manual, policy statements or other publications. We will lend you one copy of the System Standards Manual promptly after we sign this Agreement. We will send you any System Standards Manual revisions and/or supplements as and when issued. We will send you all other publications for Chain franchisees and all separate policy statements in effect from time to time.

4.8     **Inspections and Audits.** We have the unlimited right to conduct unannounced quality assurance inspections of the Facility and its operations, records and Mark usage to test the Facility's compliance with System Standards and this Agreement, and the audits described in Section 3.8. We have the unlimited right to reinspect if the Facility does not achieve the score required on an inspection. We may impose a reinspection fee and will charge you for our costs as provided in Section 3.9. You will pay us an "Audit Fee" of $300.00 when we invoice you for an Audit Fee under Section 3.8. We may increase the Audit Fee on a Chain-wide basis to cover any increases in our audit costs to not more than $500.00, effective any time after December 31, 2005. Our inspections are solely for the purposes of checking compliance with System Standards.

5.     **Term.** The Term begins on the Effective Date and expires on the day prior to the twentieth anniversary of the Opening Date. Some of your duties and obligations will survive termination or expiration of this Agreement. You will execute and deliver to us with this Agreement a notarized Declaration of Franchise Agreement (the "Declaration") in recordable form. We will countersign and return one copy of the Declaration to you. We may, at our option, record the Declaration in the real property records of the county where the Facility is located. The Declaration will be released at your request and expense when this Agreement terminates or expires and you perform your post-termination obligations. NEITHER PARTY HAS RENEWAL RIGHTS OR OPTIONS.

6.     **Application and Initial Fees.** We should receive from you a non-refundable Application Fee of $1,000.00. You will pay us a non-refundable Initial Fee in the amount of $24,000.00, when you sign this Agreement, which is fully earned when we sign this Agreement.

7.     **Recurring Fees, Taxes and Interest.**

7.1     You will pay us certain "Recurring Fees" in U.S. dollars (or such other currency as we may direct if the Facility is outside the United States) 15 days after the month in which they accrue, without billing or demand. Recurring Fees include the following:

7.1.1     A "Royalty" equal to five percent (5%) of Gross Room Sales of the Facility accruing during the calendar month, accrues from the earlier of the Opening Date or the date you identify the Facility as a Chain Facility or operate it under a Mark until the end of the Term.

7.1.2     A "System Assessment Fee" as stated in Schedule C to be paid into the Advertising and Reservation Fund, accrues from the Opening Date until the end of the Term, including during suspension periods. Upon 60 days written notice, we may change the System Assessment Fee after the tenth anniversary of the Effective Date to cover costs as described in Schedule C or to cover the cost of additional services or programs for Chain Facilities. At our option, you will also pay or reimburse us for travel and other agent commissions paid for reservations at the Facility and other fees levied to pay

for reservations for the Facility originated or processed through other reservation systems, the Internet and networks. We may charge a reasonable service fee for this service.

7.2    "Taxes" are equal to any federal, state or local sales, gross receipts, use, value added, excise or similar taxes assessed against us on the Recurring Fees by the jurisdictions where the Facility is located, but not including any income tax, franchise or other tax for our privilege of doing business in your State. You will pay Taxes directly to us when due.

7.3    "Interest" is payable on any past due amount payable to us under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid. Interest is payable when you receive our invoice.

7.4    If a Transfer occurs, your transferee or you will pay us a "Relicense Fee" equal to the Initial Fee we would then charge a new franchisee for the Facility.

8.    Indemnifications.

8.1    Independent of your obligation to procure and maintain insurance, you will indemnify, defend and hold the Indemnitees harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by any Indemnitee for any investigation, claim, action, suit, demand, administrative or alternative dispute resolution proceeding, relating to or arising out of any transaction, occurrence or service at, or involving the operation of, the Facility, any breach or violation of any contract or any law, regulation or ruling by, or any act, error or omission (active or passive) of, you, any party associated or affiliated with you or any of the owners, officers, directors, employees, agents or contractors of you or your affiliates, including when you are alleged or held to be the actual, apparent or ostensible agent of the Indemnitee, or the active or passive negligence of any Indemnitee is alleged or proven. You have no obligation to indemnify an Indemnitee for damages to compensate for property damage or personal injury if a court of competent jurisdiction makes a final decision not subject to further appeal that the Indemnitee engaged in willful misconduct or intentionally caused such property damage or bodily injury. This exclusion from the obligation to indemnify shall not, however, apply if the property damage or bodily injury resulted from the use of reasonable force by the Indemnitee to protect persons or property.

8.2    You will respond promptly to any matter described in the preceding paragraph, and defend the Indemnitee. You will reimburse the Indemnitee for all costs of defending the matter, including reasonable attorneys' fees, incurred by the Indemnitee if your insurer or you do not assume defense of the Indemnitee promptly when requested, or separate counsel is appropriate, in our discretion, because of actual or potential conflicts of interest. We must approve any resolution or course of action in a matter that could directly or indirectly have any effect on parties other than you and the complaining party in the matter, or could serve as a precedent for other matters.

8.3 We will indemnify, defend and hold you harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by you in any action or claim arising from your proper use of the System alleging that your use of the System and any property we license to you is an infringement of a third party's rights to any trade secret, patent, copyright, trademark, service mark or trade name. You will promptly notify us in writing when you become aware of any alleged infringement or an

SUPERJICI 1/00
82661

action is filed against you. You will cooperate with our defense and resolution of the claim. We may resolve the matter by obtaining a license of the property for you at our expense, or by requiring that you discontinue using the infringing property or modify your use to avoid infringing the rights of others.

## 9. Your Assignments, Transfers and Conveyances.

9.1 **Transfer of the Facility.** This Agreement is personal to you (and your owners if you are an entity). We are relying on your experience, skill and financial resources (and that of your owners and guarantors, if any) to sign this Agreement with you. You may finance the Facility and grant a lien, security interest or encumbrance on it without notice to us or our consent. If a Transfer is to occur, the transferee or you must comply with Section 9.3. Your License is subject to termination when the Transfer occurs. The License is not transferable to your transferee, who has no right or authorization to use the System and the Marks when you transfer ownership or possession of the Facility. The transferee may not operate the Facility under the System, and you are responsible for performing the post-termination obligations in Section 13. You and your owners may, only with our prior written consent and after you comply with Sections 9.3 and 9.6, assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise. Transactions involving Equity Interests that are not Equity Transfers do not require our consent and are not Transfers.

9.2 **Public Offerings and Registered Securities.** You may engage the first registered public offering of your Equity Interests only after you pay us a public offering fee equal to $25,000. Your Equity Interests (or those of a person, parent, subsidiary, sibling or affiliate entity, directly or indirectly controlling you), are freely transferable without the application of this Section if they are, on [...] date, or after the public offering fee is paid, they become, registered under the federal [...] of 1933, as amended, or a class of securities registered under the Securities Exchange [...] as amended, or listed for trading on a national securities exchange or the automated [...] of the National Association of Securities Dealers, Inc. (or any successor system), [...] any tender offer for at least a majority of your Equity Interests will be an Equity Transfer [...] Section 9.1.

9.3 **[...].** We may, to the extent permitted by applicable law, condition and withhold our consent to a Transfer when required under this Section 9 until the transferee and you meet certain conditions. If a Transfer is to occur, the transferee (or you, if an Equity Transfer is involved) must first submit our Application, qualify to be a franchisee in our sole discretion, given the scope of the proposed Transfer, provide the same supporting documents as a new franchise applicant, pay the Application and Relicense Fees then in effect, sign the form of Franchise Agreement and other conversion transactions and agree to renovate the Facility as we reasonably determine, [...] achieves a score of less than "Satisfactory" on its most recent Quality Assurance [...] or will provide a Punch List of improvements we will require after we receive the [...] application. We must also receive general releases from you and each of your owners, [...] all amounts then owed to us and our affiliates by you, your owners, your affiliates, the [...] owners and affiliates, under this Agreement or otherwise. Our consent to the transaction [...] be until these conditions are satisfied.

10

**9.4 Permitted Transferee Transactions.** You may transfer an Equity Interest or effect an Equity Transfer to a Permitted Transferee without obtaining our consent, renovating the Facility or paying a Relicense Fee or Application Fee. No Transfer will be deemed to occur. You also must not be in default and you must comply with the application and notice procedures specified in Sections 9.3 and 9.6. Each Permitted Transferee must first agree in writing to be bound by this Agreement, or at our option, execute the Franchise Agreement form then offered prospective franchisees. No transfer to a Permitted Transferee shall release a living transferor from liability under this Agreement or any guarantor under any Guaranty of this Agreement. You must comply with this Section if you transfer the Facility to a Permitted Transferee. A transfer resulting from a death may occur even if you are in default under this Agreement.

**9.5 Attempted Transfers.** Any transaction requiring our consent under this Section 9 in which our consent is not first obtained shall be void, as between you and us. You will continue to be liable for payment and performance of your obligations under this Agreement until we terminate this Agreement, all your financial obligations to us are paid and all System identification is removed from the Facility.

**9.6 Notice of Transfers.** You will give us at least 30 days prior written notice of any proposed Transfer or Permitted Transferee transaction. You will notify us when you sign a contract to Transfer the Facility and 10 days before you intend to close on the transfer of the Facility. We will respond to all requests for our consent and notices of Permitted Transferee transactions within a reasonable time not to exceed 30 days. You will notify us in writing within 30 days after a change in ownership of 25% or more of your Equity Interests that are not publicly held or that is not an Equity Transfer, or a change in the ownership of the Facility if you are not its owner. You will provide us with lists of the names, addresses, and ownership percentages of your owner(s) at our request.

**10.** **Our Assignments.** We may assign, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent. We will have no obligations to you after you are notified that our transferee has assumed our obligations under this Agreement except those that arose before we assign this Agreement.

**11.** **Default and Termination.**

**11.1 Default.** In addition to the matters identified in Sections 3.1 and 3.8 you will be in default under this Agreement if (a) you do not pay us when a payment is due, (b) you do not perform any of your other obligations when this Agreement and the System Standards Manual require, or (c) if you otherwise breach this Agreement. If your default is not cured within ten days after you receive written notice from us that you have not filed your monthly report, paid us any amount that is due or breached your obligations regarding Confidential Information, or within 30 days after you receive written notice from us of any other default (except as noted below), then we may terminate this Agreement by written notice to you under Section 11.2. We will not exercise our right to terminate if you have completely cured your default, or until any waiting period required by law has elapsed, or, in the case of quality assurance default, you have acted diligently to cure the default but cannot do so and have entered into a written improvement agreement with us within 30 days after the failing inspection to cure the default within 90 days after the inspection. We may terminate this Agreement if you do not perform that improvement agreement.

**11.2 Termination.** We may terminate the License, or this Agreement if the Opening Date has not occurred, effective when we send written notice to you or such later date as required by law or as stated in the default notice, when (1) you do not cure a default as provided in Section 11.1 or we are authorized to terminate under Section 3.1, (2) you discontinue operating the Facility as a "Super 8 Motel", (3) you do or perform, directly or indirectly, any act or failure to act that in our reasonable judgment is or could be injurious or prejudicial to the goodwill associated with the Marks or the System, (4) you lose possession or the right to possession of the Facility, (5) you (or any guarantor) suffer the termination of another license or franchise agreement with us or one of our affiliates, (6) you intentionally maintain false books and records or submit a materially false report to us, (7) you (or any guarantor) generally fail to pay debts as they come due in the ordinary course of business, (8) you, any guarantor or any of your owners or agents misstated to us or omitted to tell us a material fact to obtain or maintain this Agreement with us, (9) you receive two or more notices of default from us in any one year period (whether or not you cure the defaults), (10) a violation of Section 9 occurs, (11) you or any of your Equity Interest owners contest in court the ownership or right to license or franchise all or any part of the System or the validity of any of the Marks, (12) you, any guarantor or the Facility is subject to any voluntary or involuntary bankruptcy, liquidation, dissolution, receivership, assignment, reorganization, moratorium, composition or a similar action or proceeding that is not dismissed within 60 days after its filing, or (13) you maintain or operate the Facility in a manner that endangers the health or safety of the Facility's guests.

## 11.3   Casualty and Condemnation.

11.3.1   You will notify us promptly after the Facility suffers a Casualty that prevents you from operating in the normal course of business, with less than 75% of guest rooms available. You will give us information on the availability of guest rooms and the Facility's ability to honor advance reservations. You will tell us in writing within 60 days after the Casualty whether or not you will restore, rebuild and refurbish the Facility to conform to System Standards and its condition prior to the Casualty. This restoration will be completed within 180 days after the Casualty. You may decide within the 60 days after the Casualty, and if we do not hear from you, we will assume that you have decided, to terminate the License, effective as of the date of your notice or 60 days after the Casualty, whichever comes first. If the License so terminates, you will pay all amounts accrued prior to termination and follow the post-termination requirements in Section 13. You will not be obligated to pay Liquidated Damages if the Facility will no longer be used as a transient lodging facility after the Casualty.

11.3.2   You will notify us in writing within 10 days after you receive notice of any proposed Condemnation of the Facility, and within 10 days after receiving notice of the Condemnation date. This Agreement will terminate on the date the Facility or a substantial portion is conveyed to or taken over by the condemning authority.

11.3.3   The exclusive territory covenants in Section 2 will terminate when you give us notice of any proposed Condemnation or that you will not restore the Facility after a Casualty.

**11.4   Our Other Remedies.** If you violate your covenant in Section 2, we may reduce the Protected Territory to the Location. We may suspend the Facility from the Reservation System for any default or failure to pay or perform under this Agreement, discontinue Reservation System referrals to

the Facility for the duration of such suspension, and may divert previously made reservations to other Chain Facilities after giving notice of non-performance, non-payment or default. All Reservation System User Fees accrue during the suspension period. Reservation service will be restored after you have fully cured any and all defaults and failures to pay and perform. We may deduct or assess points under our quality assurance inspection program for your failure to comply with this Agreement or System Standards. We may omit the Facility from the Directory if you are in default on the date we must determine which Chain Facilities are included in the Directory. You recognize that any use of the System not in accord with this Agreement will cause us irreparable harm for which there is no adequate remedy at law, entitling us to injunctive and other relief. We may litigate to collect amounts due under this Agreement without first issuing a default or termination notice. If needed, our consent or approval may be withheld while you are in default under this Agreement or may be conditioned on the cure of all your defaults.

11.5    **Your Remedies.** If we fail to issue our approval or consent as and when required under this Agreement within a reasonable time of not less than 30 days after we receive all of the information we request, and you believe our refusal to approve or consent is wrongful, you may bring a legal action against us to compel us to issue our approval or consent to the obligation. To the extent permitted by applicable law, this action shall be your exclusive remedy. We shall not be responsible for direct, indirect, special, consequential or exemplary damages, including, but not limited to, lost profits or revenues.

## 12.    Liquidated Damages.

12.1    **Generally.** If we terminate the License under Section 11.2, or you terminate this Agreement (except under Section 11.3 or as a result of our default which we do not cure within a reasonable time after written notice), you will pay us Liquidated Damages within 30 days following the date of Termination. If Termination occurs during the last two License Years of the Term, Liquidated Damages will be the lesser of (i) the amount specified in Section 18.6, or (ii) the average daily fees based on a percentage of Gross Room Revenues accruing under Section 7.1 during the 12 full calendar months preceding the month in which Termination occurs multiplied by the number of days remaining in the unexpired Term (the "Ending Period") at the date of Termination. You will also pay any applicable Taxes assessed on such payment. Before the last two License Years, Liquidated Damages will be as set forth in Section 18.6. If we terminate this Agreement under Section 3 before the Opening Date, you will pay us within 10 days after you receive our notice of termination Liquidated Damages equal to one-half the amount payable under the preceding sentence. Liquidated Damages are paid in place of our claims for lost future Recurring Fees under this Agreement. Our right to receive other amounts due under this Agreement is not affected.

12.2    **Condemnation Payments.** If a Condemnation occurs, you will pay us the fees set forth in Section 7 for a period of one year after we receive the initial notice of condemnation described in Section 11.3.2 or until the Condemnation occurs, whichever is longer. If the Condemnation is completed before the one year notice period expires, you will pay us Liquidated Damages equal to the average daily Royalties and System Assessment Fees for the 12 month period preceding the date of your condemnation notice to us multiplied by the number of days remaining in the one year notice period. This payment will be made within 30 days after Condemnation is completed (when you close

the Facility or you deliver it to the condemning authority). If the Condemnation is completed after the one year notice period expires you will pay no Liquidated Damages, but the fees set forth in Section 7 must be paid when due until Condemnation is completed.

**12.3  Exclusions.** The amount of System Assessment Fees used in the computation of Liquidated Damages shall exclude travel agent commissions, airline reservation system charges and related handling charges.

**13.  <u>Your Duties At and After Termination</u>.** When this Agreement terminates for any reason whatsoever:

**13.1  System Usage Ceases.** You will immediately stop using the System to operate and identify the Facility. You will remove all signage bearing any Marks and follow the other steps detailed in the System Standards Manual for changing the identification of the Facility. You will promptly paint over or remove distinctive System trade dress, color schemes and architectural features. You shall not identify the Facility with a confusingly similar mark or name, or use the same colors as the System trade dress for signage, printed materials and painted surfaces. You will cease all Internet marketing using any Marks to identify the Facility.

**13.2  Other Duties.** You will pay all amounts owed to us under this Agreement within 10 days after termination. You will owe us Recurring Fees on Gross Room Sales accruing while the Facility is identified as a "Super 8 Motel", including the System Assessment Fees for so long as the Facility receives service from the Reservation System. We may immediately remove the Facility from the Reservation System and divert reservations as authorized in Section 11.4. We may notify third parties that the Facility is no longer associated with the Chain. We may also, to the extent permitted by applicable law, and without prior notice enter the Facility, and any other parcels, remove software (including archive and back-up copies) for accessing the Reservation System, all copies of the System Standards Manual, Confidential Information, equipment and all other personal property of ours, and paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that you have not removed or obliterated within five days after termination. You will promptly pay or reimburse us for our cost of removing such items, net of the $10.00 purchase price for signage. We will exercise reasonable care in removing or painting over signage. We will have no obligation or liability to restore the Facility to its condition prior to removing the signage. We shall have the right, but not the obligation, to purchase some or all of the Facility's Mark-bearing FF&E and supplies at the lower of their cost or net book value, with the right to set off their aggregate purchase price against any sums then owed us by you.

**13.3  Advance Reservations.** The Facility will honor any advance reservations, including group bookings, made for the Facility prior to termination at the rates and on the terms established when the reservations are made and pay when due all related travel agent commissions.

**13.4  Survival of Certain Provisions.** Sections 3.8 (as to audits, for 2 years after termination), 3.13, 7 (as to amounts accruing through termination), 8, 11.4, 12, 13, 15, 16 and 17 survive termination of this Agreement, whether termination is initiated by you or us, even if termination is wrongful.

14. **Your Representations and Warranties.** The parties disclaim making or relying upon any representation, promise, covenant, or warranty, express or implied, oral or written, except as expressly stated in this Agreement. You expressly represent and warrant to us as follows:

14.1 **Quiet Enjoyment and Financing.** You own, or will own prior to commencing improvement, or lease, the Location and the Facility. You will be entitled to possession of the Location and the Facility during the entire Term without restrictions that would interfere with your performance under this Agreement, subject to the reasonable requirements of any financing secured by the Facility. You have, when you sign this Agreement, and will maintain during the Term, adequate financial liquidity and financial resources to perform your obligations under this Agreement.

14.2 **This Transaction.** You and the persons signing this Agreement for you have full power and authority and have been duly authorized, to enter into and perform or cause performance of your obligations under this Agreement. You have obtained all necessary approvals of your owners, Board of Directors and lenders. No executory franchise, license or affiliation agreement for the Facility exists other than this Agreement. Your execution, delivery and performance of this Agreement will not violate, create a default under or breach of any charter, bylaws, agreement or other contract, license, permit, indebtedness, certificate, order, decree or security instrument to which you or any of your principal owners is a party or is subject or to which the Facility is subject. Neither you nor the Facility is the subject of any current or pending merger, sale, dissolution, receivership, bankruptcy, foreclosure, reorganization, insolvency, or similar action or proceeding on the date you execute this Agreement and was not within the three years preceding such date, except as disclosed in the Application. You will submit to us the documents about the Facility, you, your owners and your finances that we request in the Franchise Application (or after our review of your initial submissions) before or within 30 days after you sign this Agreement.

14.3 **No Misrepresentations or Implied Covenants.** All written information you submit to us about the Facility, you, your owners, any guarantor, or the finances of any such person or entity, was or will be at the time delivered and when you sign this Agreement, true, accurate and complete, and such information contains no misrepresentation of a material fact, and does not omit any material fact necessary to make the information disclosed not misleading under the circumstances. There are no express or implied covenants or warranties, oral or written, between we and you except as expressly stated in this Agreement.

15. **Proprietary Rights.**

15.1 **Marks and System.** You will not acquire any interest in or right to use the System or Marks except under this Agreement. You will not apply for governmental registration of the Marks, or use the Marks or our corporate name in your legal name, but you may use a Mark for an assumed business or trade name filing.

15.2 **Inurements.** All present and future distinguishing characteristics, improvements and additions to or associated with the System by us, you or others, and all present and future service marks, trademarks, copyrights, service mark and trademark registrations used and to be used as part of the System, and the associated good will, shall be our property and will inure to our benefit. No good will

shall attach to any secondary designator that you use.

**15.3  Other Locations and Systems.**  We and our affiliates each reserve the right to own, in whole or in part, and manage, operate, use, lease, finance, sublease, franchise, license (as licensor or licensee), provide services to or joint venture (i) distinctive separate lodging or food and beverage marks and other intellectual property which are not part of the System, and to enter into separate agreements with you or others (for separate charges) for use of any such other marks or proprietary rights, (ii) other lodging, food and beverage facilities, or businesses, under the System utilizing modified System Standards, and (iii) a Chain Facility at or for any location outside the Protected Territory.  You acknowledge that we are affiliated with or in the future may become affiliated with other lodging providers or franchise systems that operate under names or marks other than the Marks.  We and our affiliates may use or benefit from common hardware, software, communications equipment and services and administrative systems for reservations, franchise application procedures or committees, marketing and advertising programs, personnel, central purchasing, approved supplier lists, franchise sales personnel (or independent franchise sales representatives), etc.

**15.4  Confidential Information.**  You will take all appropriate actions to preserve the confidentiality of all Confidential Information.  Access to Confidential Information should be limited to persons who need the Confidential Information to perform their jobs and are subject to your general policy on maintaining confidentiality as a condition of employment or who have first signed a confidentiality agreement.  You will not permit copying of Confidential Information (including, as to computer software, any translation, decompiling, decoding, modification or other alteration of the source code of such software).  You will use Confidential Information only for the Facility and to perform under this Agreement.  Upon termination (or earlier, as we may request), you shall return to us all originals and copies of the System Standards Manual, policy statements and Confidential Information "fixed in any tangible medium of expression," within the meaning of the U.S. Copyright Act, as amended.  Your obligations under this subsection commence when you sign this Agreement and continue for trade secrets (including computer software we license to you) as long as they remain secret and for other Confidential Information, for as long as we continue to use the information in confidence, even if edited or revised, plus three years.  We will respond promptly and in good faith to your inquiry about continued protection of any Confidential Information.

**15.5  Litigation.**  You will promptly notify us of (i) any adverse or infringing uses of the Marks (or names or symbols confusingly similar), Confidential Information or other System intellectual property, and (ii) or any threatened or pending litigation related to the System against (or naming as a party) you or us of which you become aware.  We alone handle disputes with third parties concerning use of all or any part of the System.  You will cooperate with our efforts to resolve these disputes.  We need not initiate suit against imitators or infringers who do not have a material adverse impact on the Facility, or any other suit or proceeding to enforce or protect the System in a matter we do not believe to be material.

**15.6  The Internet.**  You may use the Internet to market the Facility subject to this Agreement and System Standards.  You shall not use, license or register any domain name, universal resource locator, or other means of identifying you or the Facility that uses a mark or any image or language confusingly similar to a Mark without our consent.  You will assign to us any such identification at our request without compensation or consideration.  The content you provide us

or use yourself for any Internet marketing must be true, correct and accurate, and you will notify us in writing promptly when any correction to the content becomes necessary. You shall promptly modify at our request the content of any Internet marketing material for the Facility you use, authorize, display or provide to conform to System Standards. Any use of the Marks and other elements of the System on the Internet inures to our benefit under Section 15.2.

## 16.  Relationship of Parties.

16.1  **Independence.**  You are an independent contractor. You are not our legal representative or agent, and you have no power to obligate us for any purpose whatsoever. We and you have a business relationship based entirely on and circumscribed by this Agreement. No partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement. You will exercise full and complete control over and have full responsibility for your contracts, daily operations, labor relations, employment practices and policies, including, but not limited to, the recruitment, selection, hiring, disciplining, firing, compensation, work rules and schedules of your employees.

16.2  **Joint Status.**  If you comprise two or more persons or entities (notwithstanding any agreement, arrangement or understanding between or among such persons or entities) the rights, privileges and benefits of this Agreement may only be exercised and enjoyed jointly. The liabilities and responsibilities under this Agreement will be the joint and several obligations of all such persons or entities.

## 17.  Legal Matters.

17.1  **Partial Invalidity.**  If all or any part of a provision of this Agreement violates the law of your state (if it applies), such provision or part will not be given effect. If all or any part of a provision of this Agreement is declared invalid or unenforceable, for any reason, or is not given effect by reason of the prior sentence, the remainder of the Agreement shall not be affected. However, if in our judgment the invalidity or ineffectiveness of such provision or part substantially impairs the value of this Agreement to us, then we may at any time terminate this Agreement by written notice to you without penalty or compensation owed by either party.

17.2  **Waivers, Modifications and Approvals.**  If we allow you to deviate from this Agreement, we may insist on strict compliance at any time after written notice. Our silence or inaction will not be or establish a waiver, consent, course of dealing, implied modification or estoppel. All modifications, waivers, approvals and consents of or under this Agreement by us must be in writing and signed by our authorized representative to be effective. We may unilaterally revise Schedule C when this Agreement so permits.

17.3  **Notices.**  Notices will be effective if in writing and delivered by facsimile transmission with confirmation original sent by first class mail, postage prepaid, by delivery service, with proof of delivery, or by first class, prepaid certified or registered mail, return receipt requested, to the appropriate party at its address stated below or as may be otherwise designated by notice. The parties may also communicate via electronic mail between addresses to be established by notice. You consent to receive electronic mail from us. Notices shall be deemed given on the date

delivered or date of attempted delivery, if refused.

Super 8 Motels, Inc.:
Our address: 1 Sylvan Way, P.O. Box 278, Parsippany, New Jersey 07054-0278
Attention: Vice President-Franchise Administration;
Fax No. (973) 496-5359

Your name: Jayesh Patel,
Your address: 133 South Ocan Ave., Daytona Beach, FL 32118,
Attention: Jayesh Patel;
Your fax No.: 904-239-0858.

**17.4  Remedies.** Remedies specified in this Agreement are cumulative and do not exclude any remedies available at law or in equity. The non-prevailing party will pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement.

**17.5  Miscellaneous.** This Agreement is exclusively for the benefit of the parties. There are no third party beneficiaries. No agreement between us and anyone else is for your benefit. The section headings in this Agreement are for convenience of reference only.

**17.6  Choice of Law; Venue; Dispute Resolution.**

**17.6.1**  This Agreement will be governed by and construed under the laws of the State of New Jersey, except for its conflicts of law principles. The New Jersey Franchise Practices Act will not apply to any Facility located outside the State of New Jersey.

**17.6.2**  The parties shall attempt in good faith to resolve any dispute concerning this Agreement or the parties' relationship promptly through negotiation between authorized representatives. If these efforts are not successful, either party may attempt to resolve the dispute through non-binding mediation. Either party may request mediation through the National Franchise Mediation Program, using the procedures employed by the CPR Institute for Dispute Resolution, Inc. We will provide you with the contact address for that organization. The mediation will be conducted by a mutually acceptable and neutral third party. If the parties cannot resolve the dispute through negotiation or mediation, or choose not to negotiate or mediate, either party may pursue litigation.

**17.6.3**  You consent and waive your objection to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey for all cases and controversies under this Agreement or between we and you.

**17.6.4  Waiver of Jury Trial.** The parties waive the right to a jury trial in any action related to this Agreement or the relationship between the franchisor, the franchisee, any guarantor, and their respective successors and assigns.

**17.7  Special Acknowledgments.** You acknowledge the following statements to be true and

correct as of the date you sign this Agreement, and to be binding on you.

17.7.1  You received our Uniform Franchise Offering Circular ("UFOC") for prospective franchisees at least 10 business days before, and a copy of this Agreement and all other agreements we are asking you to sign at least 5 business days before, signing this Agreement and paying the Initial Fee to us.  You have received our UFOC at least 10 business days before you paid any fee to us or signed any contract with us.

17.7.2  Neither we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement that is not written in this Agreement.  You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement.

17.7.3  This Agreement, together with the exhibits and schedules attached, is the entire agreement superseding all previous oral and written representations, agreements and understandings of the parties about the Facility and the License.

17.7.4  You acknowledge that no salesperson has made any promise or provided any information to you about projected sales, revenues, income, profits or expenses from the Facility except as stated in Item 19 of the UFOC or in a writing that is attached to this Agreement.

17.7.5  You understand that the franchise relationship is an arms' length, commercial business relationship in which each party acts in its own interest.

18.  **Special Stipulations.**  The following special stipulations apply to this Agreement and supersede any inconsistent or conflicting provisions.  These are personal to you and are not transferable or assignable except to a Permitted Transferee.

18.1  **Your Additional Termination Right.** You may terminate the License without cause or penalty effective only on the fifth or tenth anniversary of the Opening Date provided you give us at least six (6) months prior written notice of termination and you are not in default under this Agreement at the time notice must be given or at the effective date of termination.  You will pay no Liquidated Damages if you satisfy the conditions of the preceding sentence and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination.  Your rights under this Section will automatically terminate without notice if and as of the date (i) a Termination occurs, (ii) you fail to cure any default under this Agreement within the time permitted, if any, in the notice of default we send you, or (iii) after the Facility satisfies the Improvement Obligation, the Facility scores more than 275 (or its then equivalent) on a quality assurance inspection and then fails to achieve a score of less than 275 (or its then equivalent) in a reinspection to be performed no sooner than 30 days after the initial inspection.  You will not exercise this right if the Facility is then financed under a program in which the United States Small Business Administration ("SBA") guarantees the financing or its repayment unless you first obtain SBA's consent.

18.2  **Our Additional Termination Right.**  We may terminate the License without cause or

penalty effective only on the fifth or tenth anniversary of the Opening Date provided we give you at least six (6) months prior written notice of termination. You will perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. You will pay no Liquidated Damages in the event that we terminate the License under this Section and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. We will not exercise this right if you notify us that the Facility is then financed under a program in which the United States Small Business Administration ("SBA") guarantees the financing or its repayment unless we first obtain SBA's consent.

**18.3 Reduced Relicense Fee.** If you are not then in default under this Agreement, the Relicense Fee for a Transfer will be $5,000.00 if we receive the written Transfer request before the fifth anniversary of the Opening Date. After that anniversary, the Relicense Fee will be as specified in Section 7.4.

**18.4 Signage Credit.** We will pay you a signage credit, to help you defray the cost of your System signage, if you meet the conditions set forth in this Section 17.8. The credit will be in the amount of $100.00 multiplied by the number of open guest rooms at the Facility when it opens, up to a maximum of $10,000.00. The conditions are: (a) The Facility must open with at least 50 rooms meeting System Standard open and rentable to guests; (b) You must complete all pre-opening improvements required under the Punch List before the Opening Date; (c) You must meet the opening deadline specified in Section 3.1; (d) You must obtain your signage bearing Marks from one of our official Approved Suppliers; (e) You must sign this Agreement and pay the full amount of your Initial Fee no later than January 12, 2001. You will receive a credit against your Royalties accruing under Section 7 in the amount of the signage credit unless you request a cash payment in writing before the Opening Date. We may deduct from the cash payment any amounts you otherwise may owe us or Cendant Supplier Services, Inc.

**18.5 Transfer Rights.** If you are not in default under this Agreement, at any time before the end of the first License Year, you may assign this Agreement at the same time as you convey the Facility to an entity in which you or the persons listed on Schedule B as the original owners of your Equity Interests are to be owners of at least 51% of the Equity Interests of the entity and retain control over the entity so that change of control, as defined in an Equity Transfer (Appendix A) does not occur. The transferee and you must sign and deliver to us the Assignment and Assumption Agreement in the form attached as Exhibit D before you transfer the Facility. No Application or Relicense Fees will be charged. The accounts of the transferee and you must be current at the time of transfer, or we will not recognize the transfer. The transferee must submit an application on our standard form and its organizational agreement or charter with the Assignment and Assumption Agreement. We will not recognize the transfer as effective until these documents are completed and delivered to us. The transferee must send us a copy of the warranty deed conveying the Facility within 30 days after its delivery.

**18.6 Liquidated Damages.** Liquidated Damages payable under Section 12.1 for a Termination that occurs before the last two License Years will be One Thousand Dollars ($1,000.00) for each guest room of the Facility you are authorized to operate at the time of Termination.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first stated above.

WE:
**Super 8 Motels, Inc.**

By: _____
        Vice President

Attest: _____
           Assistant Secretary

**YOU** as franchisee:
**Jayesh Patel**

By: _____
        Jayesh Patel, Individually

Witness: _____

## APPENDIX A

### DEFINITIONS

<u>Advertising and Reservation Fund or "the Fund"</u> means The Super 8 Advertising and Reservation Fund into which System Assessment Fees are paid. The Fund is under our exclusive control, and shall be used by us for funding and administering, in our sole discretion, the reservation system, the training school, the "VIP Club" credit card program, national and international directories, print and broadcast media advertising, technical and professional advice, consultation and services in connection with advertising, employment of personnel and office expenses for the administration of the Fund, advertising agency commissions, and other advertising or promotional programs we establish to promote the Chain.

<u>Agreement</u> means this Franchise Agreement.

<u>Application Fee</u> means the fee you pay when you submit your Application under Section 6.

<u>Approved Plans</u> means your plans and specifications for constructing or improving the Facility initially or after opening, as approved by us under Section 3.

<u>Casualty</u> means destruction or significant damage to the Facility by act of God or other event beyond your reasonable anticipation and control.

<u>Chain</u> means the network of Chain Facilities.

<u>Chain Facility</u> means a lodging facility we own, lease, manage, operate or authorize another party to operate using the System and identified by the Marks.

<u>Condemnation</u> means the taking of the Facility for public use by a government or public agency legally authorized to do so, permanently or temporarily, or the taking of such a substantial portion of the Facility that continued operation in accordance with the System Standards, or with adequate parking facilities, is commercially impractical, or if the Facility or a substantial portion is sold to the condemning authority in lieu of condemnation.

<u>Conference Fee</u> means the fee we charge for your attendance at a conference for Chain Facilities and their franchisees when and if held.

<u>Confidential Information</u> means any trade secrets we own or protect and other proprietary information not generally known to the lodging industry including confidential portions of the System Standards Manual or information we otherwise impart to you and your representatives in confidence. Confidential Information includes the "Rules of Operation Manual" and all other System Standards manuals and documentation, including those on the subjects of employee relations, finance and administration, field operation, purchasing and marketing, the Reservation System software and applications software.

<u>Declaration</u> means the Declaration of Franchise Agreement you and we sign under Section 5.

<u>Design Standards</u> mean standards specified in the System Standards Manual from time to time for design, construction, renovation, modification and improvement of new or existing Chain Facilities, including all aspects of facility design, number of rooms, rooms mix and configuration, construction materials, workmanship, finishes, electrical, mechanical, structural, plumbing, HVAC, utilities, access, life safety, parking, systems, landscaping, amenities, interior design and decor and the like for a Chain Facility.

<u>Directory</u> means the general purpose directory we publish listing the names and addresses of Chain Facilities, and at our discretion, other Super 8 Motels and Super Suites facilities located outside the United States, Canada and Mexico.

<u>Effective Date</u> means the date we insert in the Preamble of this Agreement after we sign it.

<u>Equity Interests</u> shall include, without limitation, all forms of equity ownership of you, including voting stock interests, partnership interests, limited liability company membership or ownership interests, joint and tenancy interests, the proprietorship interest, trust beneficiary interests and all options, warrants, and instruments convertible into such other equity interests.

<u>Equity Transfer</u> means any transaction in which your owners or you sell, assign, transfer, convey, pledge, or suffer or permit the transfer or assignment of, any percentage of your Equity Interests that will result in a change in control of you to persons other than those disclosed on Schedule B, as in effect prior to the transaction. Unless there are contractual modifications to your owners' rights, an Equity Transfer of a corporation or limited liability company occurs when either majority voting rights or beneficial ownership of more than 50% of the Equity Interests changes. An Equity Transfer of a partnership occurs when a newly admitted partner will be the managing, sole or controlling general partner, directly or indirectly through a change in control of the Equity Interests of an entity general partner. An Equity Transfer of a trust occurs when either a new trustee with sole investment power is substituted for an existing trustee, or a majority of the beneficiaries convey their beneficial interests to persons other than the beneficiaries existing on the Effective Date. An Equity Transfer does <u>not</u> occur when the Equity Interest ownership among the owners of Equity Interests on the Effective Date changes without the admission of new Equity Interest owners. An Equity Transfer occurs when you merge, consolidate or issue additional Equity Interests in a transaction which would have the effect of diluting the voting rights or beneficial ownership of your owners' combined Equity Interests in the surviving entity to less than a majority.

<u>Facility</u> means the Location, together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties existing at the Location on the Effective Date or afterwards.

<u>FF&E</u> means furniture, fixtures and equipment.

<u>FF&E Standards</u> means standards specified in the System Standards Manual for FF&E and supplies to be utilized in a Chain Facility.

<u>Food and Beverage</u> means any restaurant, catering, bar/lounge, entertainment, room service, retail food

or beverage operation, continental breakfast, food or beverage concessions and similar services offered at the Facility.

Gross Room Sales means gross revenues attributable to or payable for rentals of guest rooms at the Facility, including all credit transactions, whether or not collected, but excluding separate charges to guests for Food and Beverage, room service, telephone charges, key forfeitures and entertainment; vending machine receipts; and federal, state and local sales, occupancy and use taxes.

Improvement Obligation means your obligation to either (i) renovate and upgrade the Facility, or (ii) construct and complete the Facility, in accordance with the Approved Plans and System Standards, as described in Section 3.

Indemnitees means us, our direct and indirect parent, subsidiary and sister corporations, and the respective officers, directors, shareholders, employees, agents and contractors, and the successors, assigns, personal representatives, heirs and legatees of all such persons or entities.

Initial Fee means the fee you are to pay for signing this Agreement as stated in Section 6.

License means the non-exclusive license to operate the type of Chain Facility described in Schedule B only at the Location, using the System and the Mark we designate in Section 1.

License Year means a one year period beginning on the Opening Date or any subsequent anniversary of the Opening Date and ending on the day preceding the next anniversary of the Opening Date.

Liquidated Damages means the amounts payable under Section 12, set by the parties because actual damages will be difficult or impossible to ascertain on the Effective Date and the amount is a reasonable pre-estimate of the damages that will be incurred and is not a penalty.

Location means the parcel of land situated at 133 South Ocean Ave., Daytona Beach, FL 32118, as more fully described in Schedule A.

Losses and Expenses means all payments or obligations to make payments either (i) to or for third party claimants by any and all Indemnitees, including guest refunds, or (ii) incurred by any and all Indemnitees to investigate, respond to or defend a matter, including without limitation investigation and trial charges, costs and expenses, attorneys' fees, experts' fees, court costs, settlement amounts, judgments and costs of collection.

Maintenance Standards means the standards specified from time to time in the System Standards Manual for repair, refurbishment and replacement of FF&E, finishes, decor, and other capital items and design materials in Chain Facilities.

Marks means, collectively (i) the service marks associated with the System published in the System Standards Manual from time to time including, but not limited to, the name, design and logo for "Super 8 Motel" and other marks (U.S. Reg. Nos.: 992,721; 1,691,852; 1,686,653; 1,706,143; 1,602,723; 1,343,591, and 1,768,824) and (ii) trademarks, trade names, trade dress, logos and derivations, and associated good will and related intellectual property interests.

**Marks Standards** means standards specified in the System Standards Manual for interior and exterior Mark-bearing signage, advertising materials, china, linens, utensils, glassware, uniforms, stationery, supplies, and other items, and the use of such items at the Facility or elsewhere.

**Opening Date** means the date on which we authorize you to open the Facility for business identified by the Marks and using the System.

**Operations Standards** means standards specified in the System Standards Manual for cleanliness, housekeeping, general maintenance, repairs, concession types, food and beverage service, vending machines, uniforms, staffing, employee training, guest services, guest comfort and other aspects of lodging operations.

**Permitted Transferee** means (i) any entity, natural person(s) or trust receiving from the personal representative of an owner any or all of the owner's Equity Interests upon the death of the owner, if no consideration is paid by the transferee or (ii) the spouse or adult issue of the transferor, if the Equity Interest transfer is accomplished without consideration or payment, or (iii) any natural person or trust receiving an Equity Interest if the transfer is from a guardian or conservator appointed for an incapacitated or incompetent transferor.

**Protected Territory** means the area to include a 1/4 mile radius on either side of the centerline of Atlantic Ave., commencing at and including 2523 South Atlantic Ave. and proceeding along the centerline in a northerly direction up to and including Pelican Ave..

**Punch List** means the list of upgrades and improvements attached as part of Schedule B, which you are required to complete under Section 3.

**Recurring Fees** means fees paid to us on a periodic basis, including without limitation, Royalties, System Assessment Fees, and other reservation fees and charges as stated in Section 7.

**Relicense Fee** means the fee your transferee or you pay to us under Section 7 when a Transfer occurs.

**Reservation System** or "Central Reservation System" means the system for offering to interested parties, booking and communicating guest room reservations for Chain Facilities described in Section 4.2.

**Rooms Addition Fee** means the fee we charge you for adding guest rooms to the Facility.

**Royalty** means the monthly fee you pay to us for use of the System under Section 7.1.1. "Royalties" means the aggregate of all amounts owed as a Royalty.

**System** means the comprehensive system for providing guest lodging facility services under the Marks as we specify which at present includes only the following: (a) the Marks; (b) other intellectual property, including Confidential Information, System Standards Manual and know-how; (c) marketing, advertising, publicity and other promotional materials and programs; (d) System Standards;

(e) training programs and materials; (f) quality assurance inspection and scoring programs; and (g) the Reservation System.

**System Assessment Fee** means the aggregate of all fees charged under Section 7.1.2 to pay for the cost of the System's marketing, advertising, Reservation System, training and other services.

**System Standards** means the standards for the participating in the System published in the System Standards Manual, including but not limited to Design Standards, FF&E Standards, Marks Standards, Operations Standards, Technology Standards and Maintenance Standards and any other standards, policies, rules and procedures we promulgate about System operation and usage.

**System Standards Manual** means the Rules of Operations Manual, the Trademark Identification Standards Manual and any other manual we publish or distribute specifying the System Standards.

**Taxes** means the amounts payable under Section 7.2 of this Agreement.

**Technology Standards** means standards specified in the System Standards Manual for local and long distance telephone communications services, telephone, telecopy and other communications systems, point of sale terminals and computer hardware and software for various applications, including, but not limited to, front desk, rooms management, records maintenance, marketing data, accounting, budgeting and interfaces with the Reservation System to be maintained at the Chain Facilities.

**Term** means the period of time during which this Agreement shall be in effect, as stated in Section 5.

**Termination** means a termination of the License under Sections 11.1 or 11.2 or your termination of the License or this Agreement.

**Transfer** means (1) an Equity Transfer, (2) you assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise without our consent as specified in Section 9, (3) you assign (other than as collateral security for financing the Facility) your leasehold interest in (if any), lease or sublease all or any part of the Facility to any third party, (4) you engage in the sale, conveyance, transfer, or donation of your right, title and interest in and to the Facility, (5) your lender or secured party forecloses on or takes possession of your interest in the Facility, directly or indirectly, or (6) a receiver or trustee is appointed for the Facility or your assets, including the Facility. A Transfer does not occur when you pledge or encumber the Facility to finance its acquisition or improvement, you refinance it, or you engage in a Permitted Transferee transaction.

**"You" and "Your"** means and refers to the party named as franchisee identified in the first paragraph of this Agreement and its Permitted Transferees.

**"We", "Our" and "Us"** means and refers to Super 8 Motels, Inc., a South Dakota corporation, its successors and assigns.

SUPERJHC1 3/00
82661

## SCHEDULE A

(Legal Description of Facility)

## SCHEDULE B

PART I:    YOUR OWNERS:

| Name | Ownership Percentage | Type of Equity Interest |
|---|---|---|
| **Jayesh Patel** | **100%** | **Individually** |

PART II:    THE FACILITY:

Primary designation of Facility: Super 8 Motel

Number of approved guest rooms: 76.

Parking facilities (number of spaces, description): 76.

Other amenities and facilities: outdoor pool, meeting room.

PART III:    DESCRIPTION AND SCHEDULE OF RENOVATIONS TO BE COMPLETED AS THE IMPROVEMENT OBLIGATION:

**[Punch List to be attached.]**

SUPEXHC1  3/00
52661



### FRANCHISOR: SUPER 8 MOTELS, INC.

### "SCHEDULE A"
### PUNCHLIST FOR CONVERSION
### DECEMBER 12, 2000

| FACILITY | TIER | GUEST ROOMS |
|---|---|---|
| Scottish Inn (Desert Isle) | Motel | 76 |
| 133 S. Ocean Avenue | | |
| Daytona Beach, FL 32118 | | |

**OWNER/APPLICANT**
Jay Patel
(904) 253-0666

**SALESPERSON**
John Wallace
(404) 261-5322

**O.A. REPRESENTATIVE**
Andy Bunch

### PROPERTY CONDITION SUMMARY

This closed 45-year-old facility is composed of one building that has exterior corridors, single loaded guestrooms and is 2 stories in height. Construction is of concrete with a brick facade. Guestroom, public area and exterior renovations will be required. Landscaping requires upgrading to enhance curb appeal.

Located in a major tourist destination resort area, Daytona is home to Bike Weekend, The Daytona 500 (NASCAR), Black College Weekend, The Firecracker 400 (NASCAR) and is the home of the NASCAR organization.

| | EXISTING | STANDARD |
|---|---|---|
| Lobby Dimensions: | 350 SF | 220 SF |
| Guest Room Dimensions: | 276 SF | 264 SF |

### COMPLETION TIME

All items listed in this punchlist must be completed before opening as a Super 8 Motel.

2

Daytona Beach, FL
Scottish Inn (Desert Isle)



1.  Provide Super 8 exterior signage per Company standards. Signage must be purchased from a vendor approved in advance by the Franchisor, and may not be installed without prior written approval from Property Openings Department. Your License Agreement controls your use of signage and timing of installation. All existing signage (building, high-rise, channel letters, billboards, etc.) must be removed. Modification of existing signage or face replacement is prohibited.

2.  Renovate all property areas to include but not limited to; building exterior, parking lot, railings, roof, landscaping, public areas, guest rooms, guest baths, plumbing, electrical and mechanical systems. These areas must comply with all Company specifications as outlined in the Super 8 Motel Standards of Operation and Design Manual. Renderings and color boards must be submitted to "brand" Design and Development Department for consideration and review prior to commencement of renovation. All items must be new at the time of installation.

3.  Electronic locks meeting Company specifications are to be installed all guestroom entrance doors.

4.  If connecting doors exist they must be solid core, have a one way, doorknob latch set and a separate, non-keyed, 1" deadbolt lock on each connecting room door. Operating knobs must be located on room side only with flush plates on inside of doors.

5.  Hardwired smoke detectors with a backup system are required. This system may be a battery within the unit or a generator system that is capable of restoring electrical service in case of an outage.

6.  All Super 8 Motel facilities are required to provide High Speed Internet Access in guestrooms.

7.  A gas detection system must be installed in each area where gas appliances exist in the property.

8.  A Company approved Property Management System (PMS) is required.

3

Daytona Beach, FL
Scottish Inn (Desert Isle)

HANDWRITTEN OR UNAUTHORIZED REVISIONS TO THIS PUNCHLIST ARE NOT
VALID AND DO NOT BIND THE FRANCHISOR. ANY AND ALL REVISIONS TO THIS
PUNCHLIST MUST BE MADE AND APPROVED BY THE FRANCHISOR'S QUALITY
ASSURANCE DEPARTMENT.

This Punchlist identifies items that require action due to meet the Franchisor's standards. The
Franchisor does not warrant that completion of the items on this Punchlist will cause the
converting facility to be in compliance with any applicable federal, state, local codes, ordinances
or regulations. You (and your architect, contractor and engineer, if applicable) are solely
responsible for conforming the Facility to the requirements of federal, state and local codes,
ordinances and regulations that may apply to your site.

This Punchlist has been prepared on the basis of a random sample inspection of the Facility on the
date specified. The owner is responsible for meeting all Franchisor Standards. All repairs,
replacements and improvements must cause the item to meet or exceed the Franchisor's standards
published in the Standards of Operation and Design Manual.

This Punchlist will be subject to revision at the discretion of the Franchisor if the condition of the
facility changes materially or the License (Franchise) Agreement to which this is attached is
executed more than 90 days after the date of the Punchlist. Note, that ordinary wear and tear,
particularly during busy seasons, may result in the need for additional work to meet entry
standards of the Franchisor. Also, this Punchlist may become null and void if the property does
not enter the System within 180 days after the punchlist date or as otherwise specified by the
license (franchise) agreement.

This is not a License (Franchise) Agreement; the Company is not bound by this punchlist unless
and until the Company signs the License (Franchise) Agreement for the inspected facility.

NOTE: Any item on this Punchlist that is not required to be completed prior to opening as a
Super 8 Motel will continue to be evaluated for appearance and condition during all Quality
Assurance inspections conducted before the date when completion is required.

Signed:                                                Date:   12/14/00

Print Name:   JAYESH  Patel

FL DAYTONA BEACH 38
N8H

## SCHEDULE C
### March 2000

The System Assessment Fee is equal to three percent (3%) of Gross Room Sales, and is paid into the Advertising and Reservation Fund. The System Assessment Fee is a recurring, non-refundable payment. All or any part of Fund proceeds received during an accounting period need not be disbursed within that accounting period.

If you elect to participate in optional Internet reservation programs, you will be charged a fee per net reservation originated through the Internet, which is currently $2.50, that we may change in our discretion. We may charge additional fees for creating or modifying the Facility's Website, Webpage or performing other services.

Notwithstanding the above, upon 60 days written notice, after the tenth (10th) anniversary of the Effective Date of this Agreement, and at any later times, System Assessment Fee may be increased, in our sole discretion, on a Chain-wide basis to cover costs (including reasonable direct or indirect overhead costs) related to such services and programs or the cost of additional services or programs.

Other Fees.

Effective April 1, 2000

We will contact you if we receive any guest complaint about you or the Facility, and you will be responsible for resolving the complaint to the satisfaction of the guest. If you do not respond to the guest complaint within 7 calendar days, or if the guest advises us that the proposed resolution was unsatisfactory, you will be charged an assessment of $50.00, plus the costs we incur to settle the matter with the guest. This is in addition to any quality assurance penalty points that are assessed against the Facility under System Standards.

Effective July 1, 2000

If the number of guest complaints per 1,000 occupied roomnights about you or the Facility in a calendar year exceed the "Annual Facility Allotment" we establish, you will be charged an assessment of $10.00 for each additional complaint received during that year. This is in addition to the fee and penalty referred to in the immediate paragraph above.

# AMENDMENT
## ASSIGNMENT AND ASSUMPTION AGREEMENT

This "Agreement" is made and entered into as of 8|24 205 by and among JAYSEH PATEL, a Sole Proprietor ("Assignor"), BRAY & GILLESPIE XVIII, LLC, a Florida limited liability company ("Assignee"), and SUPER 8 MOTELS, INC., a South Dakota corporation (the "Company").

Recitals. Assignor is the Licensee under a License Agreement, dated as of December 12, 2000, as well as a Software and Services Agreement and an Integrated System Agreement (the "Agreements") with the Company. The Agreements are attached to this Agreement as Exhibit A and relate to the granting of a Super 8 System license for a lodging facility designated as Unit No. 12602 (the "Facility") to be developed at 133 South Ocean Avenue, Daytona Beach, FL 32118. Assignor is conveying the Facility to Assignee. Assignor desires to assign the Agreements to Assignee, which desires to assume and accept the rights and obligations under the Agreements, effective as of the date of this Agreement.

IN CONSIDERATION of the mutual promises in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged by the parties, it is agreed as follows:

1. Assignor assigns, transfers, bargains, sells, and delegates to Assignee all of its rights, title and interest in and to the Agreements, and its obligations existing and arising in the future, under the Agreements.

2. Assignee accepts and assumes the rights, benefits and obligations of the Licensee under the Agreements, effective as of the date of this Agreement, including all existing and future obligations to pay and perform under the Agreements. Assignor shall remain secondarily liable for payment and performance of the Agreements. The owners of Assignee have executed the Guaranty attached to this Agreement.

3. To induce the Company to consent to this Agreement and the assignment of the Agreements, Assignee adopts and makes to the Company the representations and warranties of Licensee set forth in the License Agreement as of the effective date of this Agreement. Assignee is the owner of fee simple title to the Facility as of the effective date of this Agreement. Assignee's owners are shown on Exhibit B attached to this Agreement.

4. Assignee will deliver, together with this Agreement, evidence of insurance meeting System Standards, as contemplated under the Agreements and the Super 8 System Standards Manuals.

5. This Agreement shall be deemed a supplement to and modification of the Agreements. All references to "the Agreement" contained therein shall mean and refer to the original form of License Agreement, Integrated System Agreement, or Software and Services Agreement, as the

1

case may be, as modified by any prior amendments and addenda and this Agreement. Except as expressly stated, no further supplements to or modifications of the Agreements are contemplated by the parties. There are no oral or other written arrangements between the Company and Assignor ~~except as expressly stated in the Agreement and any written amendments or addendum that is~~ included as part of Exhibit "A". The Agreements, as previously modified, are incorporated by this reference.

6. Assignor and Assignee acknowledge that the Company has not participated in the negotiation and documentation of the transfer transaction between the parties, and has not made any representation or warranty, nor furnished any information to either party. Assignee waives any and all claims against the Company and its officers, directors, shareholders, affiliated corporations, employees and agents arising out of the transfer of the Facility. Assignee expressly acknowledges that the Company was not a participant in such transaction and that the Company has no liability in connection therewith. Assignee acknowledges that it has made such investigations of Assignor and the Facility as it believes appropriate.

7. Any notice required under the Agreements to be sent to Assignee shall be directed to:

ASSIGNEE:

Name: BRAY & GILLESPIE XVIII, LLC,
Street: 600 North Atlantic Avenue,
City, State & Zip: Daytona Beach, FL 32118,
Fax: 386 267 1604
Attn: Charles Bray.

8. The Company consents to the assignment and assumption of the Agreements as provided in this Agreement. No waivers of performance or extensions of time to perform are granted or authorized. The Company will treat Assignee as the Licensee under the Agreements. The License of Assignor under Section 1 of the License Agreement will be terminated effective as of the date of this Agreement. The License Term of Assignee begins on the date of this Agreement and expires on February 18, 2007.

9. The Company and Assignee agree to supplement the Agreements with the following sections (the "Amendment"). To the extent of any conflict between the License Agreement and this Amendment, the Amendment shall control. You acknowledge that the existence of the Amendment and the granting of the benefits herein are strictly confidential between us and you. Part of the consideration received by us for granting the benefits is your obligation to maintain confidentiality about the Amendment and its benefits. Therefore, you agree not to disclose to any person or entity the existence or subject matter of the Amendment, or the benefits granted hereunder, except under compulsion of law or to attorneys or accountants as needed for assistance with representation of or advice to you. Within your organization, information about the Amendment will be disclosed to agents, officers, affiliates and contractors on a "need to know" basis only. If you violate this confidentiality obligation, no further benefits will be

2

available fro that time and thereafter, to the extent that the benefits have not then been fully utilized upon written notice from us.

~~9.1 Your Additional Termination Right. You may terminate the License without cause or~~ penalty effective at any time during the Term provided you have first given us at least 30 days prior written notice of termination and you are not in default under this Agreement at the time notice must be given or at the effective date of termination. You will pay no Liquidated Damages if you satisfy these conditions and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. Your rights under this Section will automatically terminate without notice if and as of the date (i) a Termination occurs, (ii) you fail to cure any default under this Agreement within the time permitted, if any, in the notice of default we send you, or (iii) after the Facility satisfies the Improvement Obligation, the Facility scores worse than 200 points (or its then equivalent) on a quality assurance inspection and then fails to achieve a score of at least 200 points (or its then equivalent) in a reinspection to be performed no sooner than 90 days after the initial inspection. You will not exercise this right if the Facility is then financed under a program in which the United States Small Business Administration ("SBA") guarantees the financing or its repayment unless you first obtain SBA's consent.

9.2 Our Additional Termination Right. We may terminate the License without cause or penalty effective at any time during the Term provided we give you at least 30 days prior written notice of termination. You will perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. You will pay no Liquidated Damages if we terminate the License under this Section and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. We will not exercise this right if you notify us that the Facility is then financed under a program in which the United States Small Business Administration ("SBA") guarantees the financing or its repayment unless we first obtain SBA's consent.

3

IN WITNESS WHEREOF, the undersigned have executed and delivered this Agreement effective as of the date first above written.

**THE COMPANY:**
**SUPER 8 MOTELS, INC.**

By: _____     Attest: _____
    Richard Saltzman                      Assistant Secretary
    Vice President
    Franchise Administration

**ASSIGNOR:**
**JAYSEH PATEL**

By: _____     Witness: _____

Print Name: _SHYESH - PATEL_
Managing Member

**ASSIGNEE:**
**BRAY & GILLESPIE XVIII, LLC**

By: _____     Witness: _____

Print Name: _Joseph G Gillespie_
Managing Member

Exhibit "A" - License Agreement and related Agreements.
Exhibit "B" - Owners of Assignee
Guaranty

4

## EXHIBIT B

Schedule "B" of the License Agreement is hereby amended as follows:

1. Owners (names, addresses and percentage equity interests; attached separate exhibit if necessary):

    a.   Of Assignee:

| | | Ownership % |
|---|---|---|
| Name:<br>Address: | Charles A. Bray<br>600 North Atlantic Avenue<br>Daytona Beach, FL 32118 | 55.00% |
| Name:<br>Address: | Joseph G. Gillespie<br>600 North Atlantic Avenue<br>Daytona Beach, FL 32118 | 45.00% |

6

**EXHIBIT B**
**(see attached)**

B 10 (Official Form 10) (12/07)

| UNITED STATES BANKRUPTCY COURT Middle District of Florida | NOV 21 2008 | PROOF OF CLAIM |

| Name of Debtor:<br>Bray & Gillespie XVIII, LLC | Case Number:<br>08-05624 — JAF |

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| Name of Creditor (the person or other entity to whom the debtor owes money or property):<br>Super 8 Worldwide, Inc. | ☐ Check this box to indicate that this claim amends a previously filed claim. |
| Name and address where notices should be sent:<br><br>David S. Catuogno, Esq., c/o Forman Holt Eliades & Ravin LLC<br>80 Route 4 East, Suite 290, Paramus, New Jersey 07652<br><br>Telephone number:<br>(201) 845-1000 | Court Claim Number:_____<br>(*if known*)<br><br>Filed on:_____ |
| Name and address where payment should be sent (if different from above):<br><br><br><br>Telephone number: | ☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check this box if you are the debtor or trustee in this case. |

| 1. Amount of Claim as of Date Case Filed:   $ 20,125.34 | 5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount. |

If all or part of your claim is secured, complete item 4 below, however, if all of your claim is unsecured, do not complete item 4.

If all or part of your claim is entitled to priority, complete item 5.

☐ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges.

Specify the priority of the claim.

| 2. Basis for Claim:  Franchise Agreement<br>(See instruction #2 on reverse side.) | ☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B). |
| 3. Last four digits of any number by which creditor identifies debtor: _____<br><br>3a. Debtor may have scheduled account as: _____<br>(See instruction #3a on reverse side.) | ☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4). |
| 4. Secured Claim (See instruction #4 on reverse side.)<br>Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.<br><br>Nature of property or right of setoff: ☐ Real Estate  ☑ Motor Vehicle  ☐ Other<br>Describe:<br><br>Value of Property:$_____  Annual Interest Rate____%<br><br>Amount of arrearage and other charges as of time case filed included in secured claim,<br><br>if any: $_____  Basis for perfection: _____<br><br>Amount of Secured Claim: $_____  Amount Unsecured: $_____ | ☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).<br><br>☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).<br><br>☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8). |
| 6. Credits: The amount of all payments on this claim has been credited for the purpose of making this proof of claim. | ☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__). |
| 7. Documents: Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (See definition of "redacted" on reverse side.)<br><br>DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.<br><br>If the documents are not available, please explain: | Amount entitled to priority:<br><br>$_____<br><br>*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment. |

| Date: 11/17/08 | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>*Korin Neff*<br>Super 8 Worldwide, Inc., By: Marcus A. Banks - Group VP Legal     x | FOR COURT USE ONLY |

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.*

**EXHIBIT C**
**(see attached)**

ITEMIZED STATEMENT
------------------

As of Date (DD-MMM-YYYY): 11-OCT-2008
Customer No        : 12602-60020-04-SUP
Category Set       :
Category Group     :
Group No           :
Bankruptcy         : No Bankruptcy Sites
Disputed           : No
Finance Charges Included: Yes

ITEMIZED STATEMENT
-----------------

Customer No : 12602-60020-04-SUP
Address : 133 S. OCEAN AVE.,DAYTONA BEACH,FL,32118-4321,US
As of Date: 31-OCT-2008

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| JUL-2008 | 46685923 | 31-JUL-08 | Actual-1000A-RO | | 0.00 | 0.00 | 92.91 | 92.91 |
| | 46687072 | 31-JUL-08 | Actual-1215A-AD | | 0.00 | 0.00 | 65.93 | 65.93 |
| | | | Sub Total | | 0.00 | 0.00 | | |
| AUG-2008 | 30216916 | 04-AUG-08 | MAR 2008 NT AUD | | 0.00 | 0.00 | 156.84 | 156.84 |
| | 30216706 | 04-AUG-08 | MAR 2008 NT AUD | | 0.00 | 0.00 | 2.97 | 2.97 |
| | | | | | 0.00 | 0.00 | 5.40 | 5.40 |
| | | | Sub Total | | 0.00 | 0.00 | 8.37 | 8.37 |
| SEP-2008 | 10271220 | 04-SEP-08 | GUEST SRVCS PRO | | 60.00 | 0.00 | 0.00 | 60.00 |
| | 30241732 | 13-SEP-08 | 8.88 Promo Reim | | (128.37) | 0.00 | 0.00 | (128.37) |
| | 30241733 | 13-SEP-08 | 8.88 Promo Reim | | (49.62) | 0.00 | 0.00 | (49.62) |
| | 30241734 | 16-SEP-08 | 8.88 Promo Reim | | (128.37) | 0.00 | 0.00 | (128.37) |
| | 30241891 | 18-SEP-08 | GUEST SRVCS PRO | | 60.00 | 0.00 | 0.00 | 60.00 |
| | 30241894 | 18-SEP-08 | 8.88 Promo Reim | | 60.00 | 0.00 | 0.00 | 60.00 |
| | 30241853 | 20-SEP-08 | 8.88 Promo Reim | | (157.62) | 0.00 | 0.00 | (157.62) |
| | 10085389 | 22-SEP-08 | WYNREWARDS Reim | | (101.37) | 0.00 | 0.00 | (101.37) |
| | 10082215 | 25-SEP-08 | WYNREWARDS 5% | | 99.51 | 0.00 | 0.00 | 99.51 |
| | 40746421 | 30-SEP-08 | GUEST SRVCS PRO | | 90.00 | 0.00 | 0.00 | 99.51 |
| | 40728095 | 30-SEP-08 | Accrual-1000A-R | | 1012.53 | 0.00 | 0.00 | 1012.53 |
| | 40728461 | 30-SEP-08 | 5064-IREEXAU | | 90.00 | 0.00 | 5.85 | 95.85 |
| | 40728869 | 30-SEP-08 | Accrual-1215A-A | | 607.59 | 0.00 | 0.00 | 607.59 |
| | | | 5033A-HES SOFTW | | 66.40 | 4.31 | 0.00 | 70.71 |
| | | | Sub Total | | 1590.68 | 10.16 | 0.00 | 1500.84 |
| OCT-2008 | 26289539 | 22-OCT-08 | WYNREWARDS 5% | | 685.88 | 0.00 | 0.00 | 685.88 |
| | 26087689 | 22-OCT-08 | WYNREWARDS CRDT | | (160.81) | 0.00 | 0.00 | (160.81) |
| | 4297774 | 24-OCT-08 | GDS 88 REIMBRSE | | 14.75 | 0.00 | 0.00 | 14.75 |
| | TN1297774 | 24-OCT-08 | MEMBER BENEFIT | | 11.00 | 0.00 | 0.00 | 11.00 |
| | TC1297774 | 24-OCT-08 | T/A COMMISSIONS | | 43.09 | 0.00 | 0.00 | 43.09 |
| | TC1297774 | 24-OCT-08 | T/A COMM SERVIC | | 2.86 | 0.00 | 0.00 | 2.86 |
| | | | Sub Total | | | | | |

ITEMIZED STATEMENT
-----------------

Customer No : 12602-60020-04-SUP
Address : 133 S. OCEAN AVE.,DAYTONA BEACH,FL,32118-4321,US
As of Date: 31-OCT-2008

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|----------|-----------|-------------|-------------|---------|---------|------------|----------------|-------|
| | | | | Sub Total | 598.77 | 0.00 | 0.00 | 598.77 |
| | | | | Grand Total | 2089.45 | 10.16 | 167.21 | 2266.82 |

Requested By: Sharmila Chatterjee

* Please note the accruals on your account are estimates.
  Make sure to promptly submit your actual gross room revenue and rooms sold.

******* END OF REPORT *******

ITEMIZED STATEMENT
-----------------

As of Date (DD-MMM-YYYY) : 31-OCT-2008
Customer No              : 12602-60020-04-SUP
Category Set             :
Category Group           :
Group No                 :
Bankruptcy               : Only Bankruptcy Sites
Disputed                 : No
Finance Charges Included : Yes

ITEMIZED STATEMENT
------------------

Customer No  : 12602-60020-04-SUP
Address      : 133 S. OCEAN AVE.,DAYTONA BEACH,FL,32118-4321.US
As of Date   : 31-OCT-2008

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|----------|-----------|--------------|-------------|---------|---------|------------|-----------------|-------|
| JUL-2008 | 40687072#1 | 31-JUL-08 | ADVERTISING : 1 | | 4546.95 | 0.00 | 0.00 | 4546.95 |
| | 40685923#1 | 31-JUL-08 | ROYALTY FEE : 1 | | 7578.25 | 0.00 | 0.00 | 7578.25 |
| | 40669007#1 | 31-JUL-08 | CounterDIRECWAY | | 150.00 | 9.75 | 0.00 | 159.75 |
| | | | Sub Total | | 12275.20 | 9.75 | 0.00 | 12284.95 |
| AUG-2008 | 30216916#1 | 04-AUG-08 | MAR 2008 NT AND | | 204.98 | 0.00 | 0.00 | 204.98 |
| | 30216706#1 | 04-AUG-08 | MAR 2008 NT AND | | 372.09 | 0.00 | 0.00 | 372.09 |
| | 10255571#1 | 14-AUG-08 | GUEST SERVCS PRO | | 60.00 | 0.00 | 0.00 | 60.00 |
| | 26080744#1 | 14-AUG-08 | GUEST SERVCS PRO | | 60.00 | 0.00 | 0.00 | 60.00 |
| | 36082313#1 | 22-AUG-08 | WYNREWARDS 5% | | 1605.18 | 0.00 | 0.00 | 1605.18 |
| | 30224668#1 | 27-AUG-08 | CREDIT | | (1195.61) | 0.00 | 0.00 | (1195.61) |
| | 30224649#1 | 27-AUG-08 | 8.88 Promo Reim | | (67.62) | 0.00 | 0.00 | (67.62) |
| | 30224645#1 | 27-AUG-08 | 8.88 Promo Reim | | (78.87) | 0.00 | 0.00 | (78.87) |
| | 30224644#1 | 27-AUG-08 | 8.88 Promo Reim | | (146.37) | 0.00 | 0.00 | (146.37) |
| | 30224647#1 | 27-AUG-08 | 8.88 Promo Reim | | (78.87) | 0.00 | 0.00 | (78.87) |
| | 42850608#1 | 29-AUG-08 | 8.88 Promo Reim | | (90.12) | 0.00 | 0.00 | (90.12) |
| | TM32850608#1 | 29-AUG-08 | GDS & INTERNET | | 86.25 | 0.00 | 0.00 | 86.25 |
| | TM32850609#1 | 29-AUG-08 | TMC & CONSORTIA | | 2.50 | 0.00 | 0.00 | 2.50 |
| | TA32850606#1 | 29-AUG-08 | MEMBER BENEFIT | | 82.40 | 0.00 | 0.00 | 82.40 |
| | TC32850608#1 | 30-AUG-08 | T/A CONM'SSIONS | | 388.81 | 0.00 | 0.00 | 388.81 |
| | 40714615#1 | 31-AUG-08 | T/A COMM SERVIC | | 24.05 | 0.00 | 0.00 | 24.05 |
| | 30225022#1 | 30-AUG-08 | 8.88 Promo Reim | | (44.50) | 0.00 | 0.00 | (44.50) |
| | 40658872#1 | 31-AUG-08 | ADVERTISING : 1 | | 2480.32 | 0.00 | 0.00 | 2480.32 |
| | 40669003#1 | 31-AUG-08 | HSS SOFTWARE MA | | 150.00 | 9.75 | 0.00 | 159.75 |
| | 40713466#1 | 31-AUG-08 | ROYALTY FEE : 1 | | 4113.86 | 7.19 | 0.00 | 4113.86 |
| | | | | | | 0.00 | 0.00 | |
| | | | Sub Total | | 7893.73 | 16.94 | 0.00 | 7893.73 |
| SEP-2008 | 30241731#1 | 01-SEP-08 | 8.88 Promo Reim | | (72.12) | 0.00 | 0.00 | (72.12) |
| | 26085218#1 | 22-SEP-08 | WYNREWARDS CRDT | | (146.22) | 0.00 | 0.00 | (146.22) |
| | 26085389#1 | 22-SEP-08 | WYNREWARDS 5% | | 544.46 | 0.00 | 0.00 | 544.46 |
| | 42914291#1 | 26-SEP-08 | GDS & INTERNET | | 5.25 | 0.00 | 0.00 | 5.25 |

ITEMIZED STATEMENT

Customer No : 12602-60020-04-SUP
Address : 133 S. OCEAN AVE.,DAYTONA BEACH,FL,32118-4321,US
As of Date: 31-OCT-2008

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|---|---|---|---|---|---|---|---|---|
| | TM32314291 | 26-SEP-08 | MEMBER BENEFIT | | 40.32 | 0.00 | 0.00 | 40.32 |
| | TA32314291 | 26-SEP-08 | 7/A COMMISSIONS | | 27.72 | 0.00 | 0.00 | 27.72 |
| | TC32914291 | 26-SEP-08 | 7/A COMM SERVIC | | 3.27 | 0.00 | 0.00 | 3.27 |
| | 407467611 | 30-SEP-08 | ADVERTISING : 1 | * | 405.00 | 0.00 | 0.00 | 405.00 |
| | 407280951 | 30-SEP-08 | CounterDIRECTWAY | | 60.00 | 3.90 | 0.00 | 63.90 |
| | 407286601 | 30-SEP-08 | HSS SOFTWARE MA | * | 44.28 | 2.88 | 0.00 | 47.16 |
| | 407466211 | 30-SEP-08 | ROYALTY FEE : 1 | * | 675.12 | 0.00 | 0.00 | 675.12 |

Sub Total  1157.08  6.78  0.00  1593.86

Grand Total  21735.07  33.47  0.00  21772.54

Requested By: Sharmila Chatterjee

* Please note the accruals on your account are estimates.
  Make sure to promptly submit your actual gross room revenue and rooms sold.

******* END OF REPORT *******

ITEMIZED STATEMENT
-----------------------------

As of Date (DD-MMM-YYYY):  17-FEB-2009
Customer No             :  12602-60020-04-SUP
Category Set            :
Category Group          :
Group No                :
Bankruptcy              :  No Bankruptcy Sites
Disputed                :  No
Finance Charges Included:  Yes

ITEMIZED STATEMENT
------------------

Customer No : 12602-60020-04-SUP
Address : 1333 S. CLEAN AVE., DAYTONA BEACH, FL, 32118-4321, US
As of Date: 17-FEB-2009

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| SEP-2008 | 40746761 | 30-SEP-08 | Accrual-1215A-A | * | 607.59 | 0.00 | 18.23 | 625.82 |
| | 40746421 | 30-SEP-08 | Accrual-1000A-R | * | 1012.53 | 0.00 | 20.27 | 1032.80 |
| | | | Sub Total | | 1620.12 | 0.00 | 38.50 | 1658.62 |
| OCT-2008 | 30259256 | 27-OCT-08 | 8.88 Promo Reim | | (85.75) | 0.00 | 0.00 | (85.75) |
| | | | Sub Total | | (85.75) | 0.00 | 0.00 | (85.75) |
| NOV-2008 | 26092928 | 22-NOV-08 | WYNREWARDS CRED | | (1205.08) | 0.00 | 0.00 | (1205.08) |
| | 30271479 | 28-NOV-08 | 8.88 Promo Reim | | (243.12) | 0.00 | 0.00 | (243.12) |
| | 30271480 | 29-NOV-08 | 8.88 Promo Reim | | (243.12) | 0.00 | 0.00 | (243.12) |
| | | | Sub Total | | (1691.32) | 0.00 | 0.00 | (1691.32) |
| DEC-2008 | 30259803 | 15-DEC-08 | JUL 2008 NT AUD | | 436.77 | 0.00 | 0.00 | 436.77 |
| | 40746328 | 31-DEC-08 | Accrual-1000A-R | * | 1583.35 | 0.00 | 0.00 | 1583.35 |
| | 40846004 | 31-DEC-08 | Accrual-1215A-A | * | 950.01 | 0.00 | 0.00 | 950.01 |
| | | | Sub Total | | 2970.13 | 0.00 | 0.00 | 2970.13 |
| JAN-2009 | 26099958 | 22-JAN-09 | WYNREWARDS 5% | | 897.08 | 0.00 | 0.00 | 897.08 |
| | 10329951 | 22-JAN-09 | GUEST SRVCS PRO | | 60.00 | 0.00 | 0.00 | 60.00 |
| | 26099544 | 22-JAN-09 | WYNREWARDS CRDT | | (238.19) | 0.00 | 0.00 | (238.19) |
| | 41172234 | 29-JAN-09 | GDS & INTERNET | | 9.60 | 0.00 | 0.00 | 9.60 |
| | TM3117223 | 29-JAN-09 | MEMBER BENEFIT | | 35.64 | 0.00 | 0.00 | 35.64 |
| | TA3117223 | 29-JAN-09 | T/A COMMISSIONS | | 133.91 | 0.00 | 0.00 | 133.91 |
| | TC3317223 | 29-JAN-09 | T/A COMMISSIONS | | 8.48 | 0.00 | 0.00 | 8.48 |
| | 40557931 | 31-JAN-09 | Accrual-1000A-R | * | 2900.80 | 0.00 | 0.00 | 2900.80 |
| | 40557921 | 31-JAN-09 | Accrual-1215A-A | * | 150.00 | 9.75 | 0.00 | 159.75 |
| | 40861987 | 31-JAN-09 | 5013A-HSS SOFTW | | 110.68 | 7.19 | 0.00 | 117.87 |

ITEMIZED STATEMENT
----------------

Customer No : 12602-60020-04-SUP
Address    : 133 S. OCEAN AVE., DAYTONA BEACH, FL, 32118-4321, US
As of Date: 17-FEB-2009

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|----------|-----------|--------------|-------------|---------|---------|-----------|----------------|-------|
|          | 40880428  | 31-JAN-09    | Accrual-12115A-A | * | 1740.48 | 0.00 | 0.00 | 1740.48 |
|          |           |              | Sub Total   |         | 508.48  | 16.94     | 60.00          | 5825.42 |
| FEB-2009 | 290       | 10-FEB-09    | Unapplied   |         | (2067.91) | 0.00    | 0.00           | (2067.91) |
|          | 30282550  | 11-FEB-09    | LEARNING LIBRAR |     | 60.00   | 0.00      | 0.00           | 60.00 |
|          |           |              | Sub Total   |         | (2067.91) | 0.00    | 0.00           | (2067.91) |
|          |           |              | Grand Total |         | 6613.75 | 16.94     | 38.50          | 6669.19 |

\* Please note the accruals on your account are estimates.
  Make sure to promptly submit your actual gross room revenue and rooms sold.

Requested By: Sharmila Chatterjee

******** END OF REPORT ********

As of Date (DD-MMM-YYYY): 17-FEB-2009
Customer No                : 12602-60020-04-SUP
Category Set               :
Category  Group            :
Group No                   :
Bankruptcy                 : Only Bankruptcy Sites
Disputed                   : No
Finance Charges Included:   Yes

ITEMIZED STATEMENT
-------------------

Customer No : 12602-60020-04-SUP
Address : 173 S. OCEAN AVE.,DAYTONA BEACH,FL,32118-4321,US
As of Date: 17-FEB-2009

| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | FinanceCharges | Total |
|----------|-----------|-------------|-------------|---------|---------|-----------|---------------|-------|
| JUL-2008 | 0068707#1 | 31-JUL-08 | ADVERTISING : 1 | | 4546.95 | 0.00 | 0.00 | 4546.95 |
| | 4068592#1 | 31-JUL-08 | ROYALTY FEE : 1 | | 7578.25 | 0.00 | 0.00 | 7578.25 |
| | 4066900#1 | 31-JUL-08 | CounterDIRECWAY | | 150.00 | 9.75 | 0.00 | 159.75 |
| | | | Sub Total | | 12275.20 | 9.75 | 0.00 | 12284.95 |
| AUG-2008 | 4071346#1 | 31-AUG-08 | ROYALTY FEE : 1 | | 4133.86 | 0.00 | 0.00 | 4133.86 |
| | 4071461S#1 | 31-AUG-08 | ADVERTISING : 1 | | 1134.29 | 0.00 | 0.00 | 1134.29 |
| | | | Sub Total | | 5268.15 | 0.00 | 0.00 | 5268.15 |
| SEP-2008 | 4074676#1 | 30-SEP-08 | ADVERTISING : 1 | | 405.00 | 0.00 | 0.00 | 405.00 |
| | 4074642#1 | 30-SEP-08 | ROYALTY FEE : 1 | | 675.12 | 0.00 | 0.00 | 675.12 |
| | | | Sub Total | | 1080.12 | 0.00 | 0.00 | 1080.12 |
| | | | Grand Total | | 18623.47 | 9.75 | 0.00 | 18633.22 |

Requested By: Sharmila Chatterjee

\* Please note the accruals on your account are estimates.
  Make sure to promptly submit your actual gross room revenue and rooms sold.

\*\*\*\*\*\*\* END OF REPORT \*\*\*\*\*\*\*

**EXHIBIT D**
**(see attached)**

# FORMAN
# HOLT
# ELIADES
# & RAVIN LLC
## ATTORNEYS AT LAW

Charles M. Forman**
Michael E. Holt**
Daniel M. Eliades*
Stephen B. Ravin**
Erin J. Kennedy***
Joseph M. Cerra**
Kim R. Lynch**
William L. Waldman**
David S. Catuogno***
Gail B. Cooperman*
Harry M. Gutfleish**
Wendy B. Green**
Kimberly J. Salomon**
Robert H. Johnson***
Marianna Udem**
Jonathan S. Bodner***

OF COUNSEL
William A. Calandra*

MEMBER NJ & PA BAR*
MEMBER NJ & NY BAR**
MEMBER NJ BAR***

www.formanlaw.com
firm@formanlaw.com

REPLY TO PARAMUS

November 7, 2008

R. Scott Shuker, Esq.
Latham Shuker Eden & Beaudine LLP
PO Box 3353
Orlando, FL 32802

**Re:    BRAY & GILLESPIE XVIII, LLC**
     **Case No: 08-05524(JAF)**

Dear Mr. Shuker:

This firm represents Super 8 Worldwide, Inc. ("SWI") in the above referenced bankruptcy proceeding. We understand that SWI and the debtor are parties to a certain license agreement pursuant to which the debtor has been authorized to operate its hotel as a "Super 8" guest lodging facility. Please contact me at your earliest convenience to advise of your client's intentions with respect to assumption/rejection of the license agreement.

Please also remind the debtor of its obligations to stay current with its post-petition monetary obligations under the license agreement. Until a debtor-in-possession is authorized by a bankruptcy court to reject an executory contract, that contract remains effective and enforceable between the parties. Matter of Computerized Steel Fabricators, Inc. 40 B.R. 344 (Bankr.S.D.N.Y. 1984); In re Tirenational Corp., 47 B.R. 647, 651 (Bankr.N.D.Ob. 1985); Central Control Alarm Corp. Black, 22 B.R. 561 (Bankr.E.D. Wisc. 1982). As a result, the debtor is required to perform its contractual obligations on a post-petition basis and must therefore pay to SWI the post-petition fees under the license agreement as they come due.

This letter does not modify, replace or affect any current or future default or termination notices, if any, from SWI or any of its affiliates regarding the license agreement. Moreover, this letter is forwarded without prejudice to or waiver of any of SWI's rights and without constituting an admission that there are no monetary or non-monetary obligations due and owing from the debtor to SWI.

80 Route 4 East
Paramus, NJ 07652
T 201.845.1000
F 201.845.9112

888 7th Ave., Suite 4500
New York, NY 10106
T 212.707.8500
F 212.707.8511

664 Chestnut Ridge Road
Spring Valley, NY 10977
T 845.371.3451
F 845.371.7667

1615 Jackson Street
Philadelphia, PA 19145
T 215.925.7191
F 215.925.7192

Please be advised that nothing contained in this letter shall be construed as an admission or a waiver of any right(s) or claim(s) that SWI may possess including, but not limited to, the right to file an administrative priority claim for the unpaid post-petition fees and/or other applicable charges. Nothing herein should be deemed to constitute SWI's acquiescence to assumption or assumption and assignment of the license agreement. SWI hereby reserves all additional rights and remedies under the license agreement, at law or equity.

Very truly yours,

*/s/ David S. Catuogno*
David S. Catuogno
DSC/dnm

m:\wyndham\bray & gillespie\ltrs\shuker-01.doc

Mr. Shuker
November 7, 2008
Page 3

bcc:    Marcus A. Banks, Esq. (Via CLIP)
        Daniel M. Eliades, Esq. (Via CLIP)